15 A.3d 798

MONTGOMERY COUNTY VOLUNTEER FIRE–RESCUE ASSOCIATION and Eric N. Bernard

v.

MONTGOMERY COUNTY BOARD OF ELECTIONS and Montgomery County, Maryland.

No. 86 Sept. Term 2010.

Court of Appeals of Maryland.

March 22, 2011.

**464**

John T. Bentivoglio (Mitchell S. Ettinger, Amy Sarbrin, Teresa A. Alutto–Schmidt, and Emily C. Helms Williams of Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC), for Appellants.

Kevin Karpinski (Victoria M. Shearer of Karpinski, Colaresi & Karp, P.A., Baltimore, MD; Edward B. Lattner, Chief, Division of Human Resources and Appeals, and Marc P. Hansen, Acting Co. Atty., Rockville, MD), for Appellees.

Douglas F. Gansler, Esquire, Atty. Gen. of Maryland, Kathleen E. Wherthey, Esquire, Jeffrey L. Darsie, Esquire, Asst. Attys. Gen., Baltimore, MD, for Amicus Curiae brief of Maryland State Board of Elections in Support of Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

GREENE, J.

After oral argument on September 29, 2010, this Court issued its per curiam Order as follows:

> For reasons to be stated later in an opinion to be filed, it is this 29th day of September, 2010,
>
> ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Montgomery County be, and it is hereby, reversed, and the matter remanded to the Circuit Court with directions to enter judgment in favor of Appellants and an order that a referendum on the validity of Montgomery County Council Bill No. 13–10 be placed on the ballot at the General Election to be held on November 2, 2010. Costs to be paid by the Appellees. Mandate to issue forthwith.

We now set forth our reasons for that Order.

## I.

On May 21, 2010, the Montgomery County Council signed into law Bill 13–10, establishing an Emergency Medical Services Transport Fee. Appellant, the Montgomery County Volunteer Fire–Rescue Association ("the Association") sponsored a petition to challenge the bill through a referendum.[1][2] To that end, the Association submitted a local petition for an advance determination of adequacy and Appellee, the Montgomery County Board of Elections [3] ("County Board") advised the Association that the format of the petition was acceptable. The County Board concurrently informed the Association that

---

1. *See* Article 16 of the Maryland Constitution; Md.Code (1957, 2005 Repl.Vol.), Article 25A, § 8 (power of referendum in chartered counties of Maryland); Montgomery County Charter § 114–115; *Doe v. Board of Elections*, 406 Md. 697, 702, 962 A.2d 342, 344–45, fn. 1 (2008) (describing the statutory and constitutional authority for citizens to seek referendum).

2. The law was subsequently defeated on referendum by Montgomery County voters during the November 2, 2010 General Election.

3. All references herein to "the Board" refer to the Montgomery County Board of Elections, unless otherwise stated.

pursuant to Sections 114 and 115 of the Montgomery County Code, 50% of the total signatures required to place the referendum on the ballot were due by August 4 with the remaining signatures to be filed by August 19. On August 3 and 4, the Association submitted signature pages containing 33,740 signatures of which the Board accepted 13,021, or approximately 42% of the required signatures, thus failing to satisfy the 50% requirement.[4]   Subsequently, on or before August 19, the Association submitted 18,937 signatures of which 5,317 were accepted.

On August 23, 2010, the Election Director for the County Board informed the Association that the August 4 filing would not be certified, pursuant to Md.Code (2003, 2010 Supp.), §§ 6–208(a) and 6–210(d) of the Election Law Article,[5] because of the failure to comply with the 50% threshold signature requirement of Section 115.   Consequently, the referendum question would not be placed on the ballot.

Subsequently, on August 31, 2010, the Association filed a "Complaint for Judicial Review and Declaratory Judgment" in the Circuit Court for Montgomery County, pursuant to § 6–209, in order to challenge the Board's refusal to certify the referendum petition.[6]   The review was expedited due to the impending general election.

According to the stipulation of facts submitted to the Circuit Court, the Board reviewed the entries on the petition for legal sufficiency using "among other things the 'State of Maryland Petition Acceptance and Verification Procedures: Statewide or Public Local Law Referendum Petition (Rev. March 2009).' "

---

4.  The August 4 filing lacked 2,346 valid signatures.

5.  All references to statutory provisions refer to the Election Law Article of the Md.Code (2003, 2010 Supp.).   The current edition of the Election Law Article is the 2010 Replacement Volume in which the germane provisions, namely, §§ 6–203, 6–204, 6–207, have been reprinted with no modifications.

6.  In the Circuit Court action, Eric N. Bernard, the Association's executive director was added as a party plaintiff and Montgomery County was granted leave to intervene as a defendant.

Using criteria cited therein, the Board rejected 20,719 of the petition entries that were submitted on August 4 and 13,620 of the signatures that were submitted on August 19. The Association identified 15,287 signatures among the 23,111 entries that were rejected because of "legibility"[7] issues with the signature itself, and both parties stipulated to the placement, or "bucketing," of those contested signatures into six categories distinguished by degrees of legibility, summarized *infra.* At oral argument before this Court, the Board conceded that if we agree with the Association's interpretation of the validation requirements of § 6–203, there would be sufficient signatures to meet the requirements under § 115 of the County Code without resorting to an independent review of the "bucketed" signatures.

On September 24, 2010, the Circuit Court granted summary judgment in favor of the Board concluding that it had not acted arbitrarily or capriciously in rejecting illegible or partially legible signatures pursuant to the requirements of Maryland statutory and common law, particularly this Court's decision in *Doe v. Board of Elections,* 406 Md. 697, 962 A.2d 342 (2008). Subsequently, the Association and the County Board noted an Appeal and Cross–Appeal, respectively, to the Court of Special Appeals. Prior to consideration by the Court of Special Appeals, we granted the petition for writ of certiorari filed by the Association and Mr. Bernard to address the following question:

> Is a signature on a local petition valid under Md.Code (2003, Supp.2010) § 6–203(a) of the Election Article if (i) an individual provides all the required printed information and that information is consistent with Maryland's voter registration list, (ii) the signer executes what she believes to be her lawful signature, legible or otherwise, and (iii) the petition circulator attests, as required by § 6–204, that the individual signed in his or her presence?

---

7. Legibility is understood to mean the quality of being clear enough to read or decipher. American Heritage Dictionary of the English Language (4th ed. 2006).

*Montgomery County Volunteer Fire–Rescue Association and
Eric N. Bernard v. Montgomery County Board of Elections
and Montgomery County, Md.,* 415 Md. 610, 4 A.3d 514 (2010)
(denying the County Board's conditional cross-petition).

## II.

■ In this case, the Board's determination that the Petition was ineligible for certification because of an insufficient number of valid signatures, made pursuant to its interpretation of § 6–203 (addressing petition signer information and validation) and our opinion in *Doe*, presents an issue of statutory construction and consequently one of law. *E.g. Opert v. Criminal Injuries*, 403 Md. 587, 593, 943 A.2d 1229, 1232 (2008) (noting that in determining whether the Criminal Injuries Compensation Board had interpreted correctly an operative word in the Criminal Injuries Compensation Act "[t]he issue before us is, indeed, one of statutory construction and therefore one of law."); *see e.g. Malick v. Athenour*, 37 Cal.App.4th 1120, 44 Cal.Rptr.2d 281, 285–86 (1995) (holding that "[t]he question of the validity of the disqualification of those signers who did not print separately each letter of their names was one of law—an issue to be resolved by the court. The trial court was not required to defer to the election department's interpretation of the law or ... adoption of a policy contrary to law.").

In the instant case, we conclude that the particular statutory provision at issue, i.e. § 6–203(a)(1), is clear and unambiguous, notwithstanding the utility of judicial gloss, and therefore we do not defer to the Board's interpretation. *Fire Fighters v. Cumberland*, 407 Md. 1, 9, 962 A.2d 374, 378–79 (2008) ("If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends."); and cases cited therein. ("When a statutory provision is entirely clear, with no ambiguity whatsoever, administrative constructions, no matter how well entrenched, are not given weight."). *Aviation Administration v. Noland*, 386 Md. 556, 572, 873 A.2d 1145, 1155 (2005) (quoting *Board of Physi-*

*cian v. Banks,* 354 Md. 59, 67–69, 729 A.2d 376, 380–381, fn. 2 (1999)).

■ In *Doe,* this Court addressed whether the requirements of § 6–203 were mandatory or directory. The issue in *Doe was:*

Did the Circuit Court [for Montgomery County] err in ruling, contrary to the strict compliance standard dictated by this Court in an unbroken line of decisions, that specific signature requirements prescribed under the election laws for referenda petitions need not be met, with the result that a referendum petition carrying an insufficient number of valid signatures was certified for the ballot?

406 Md. at 704, 962 A.2d at 346. Ultimately, we answered that question affirmatively, holding that the Circuit Court had erred in concluding that "the dictates of Section 6–203 were suggestive rather than required." *Doe,* 406 Md. at 727, 962 A.2d at 360. In *Doe,* we held that the plain meaning of § 6–203 was that the signature requirements in subsection (a)(1) were mandatory, as indicated by the direction that the signer "shall" provide a signature and other required printed or typed information. *Doe,* 406 Md. at 728, 962 A.2d at 360. To reach our decision in *Doe,* we relied upon our prior decision in *Barnes, etc. v. State, ex rel. Pinkney,* 236 Md. 564, 571–72, 204 A.2d 787, 790–91 (1964), in which this Court held that the statutory provisions regarding referendum petitions within Code (1964 Supp.) Article 33, § 169, namely, address, precinct of registration, signature, and printed name "pertain[ed] only to the identification of the signer" and §§ 169A–E provided "collateral measures to prevent fraud[.]" Consistent with *Barnes* and *Doe,* we shall construe §§ 6–203 and 6–204 (addressing the circulator's affidavit) together, in harmony, and in the context of the entire statutory scheme. In *Doe,* we concluded that when read together §§ 6–203 and 6–207 (addressing verification of the petition entries) are not ambiguous. *Doe,* 406 Md. at 731–32, 962 A.2d at 362–63. Today, we emphasize that § 6–203 requires the Board to validate signatures placed on a petition for referendum, and we answer a

question that we were not asked to address in *Doe*. The question is whether a signature must be "legible," when there is other information identifying the signer, in order to be counted pursuant to the petition validation and verification process. We hold that a signature on a petition for referendum is but one component of the voter's identity that is to be considered in the validation process, and that if the signer's entire entry is statutorily sufficient under § 6–203, an illegible signature, on its own, does not preclude validation.[8]

## III.

▪▪▪ "In statutory interpretation, our primary goal is always 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision' ... We begin our analysis by first looking to the normal, plain meaning of the language of the statute...." *Doe*, 406 Md. at 712, 962 A.2d at 350–51 and cases cited therein. Section 6–203 of the Election Law Article states, in pertinent part:

§ 6–203. **Signers; information provided by signers.**

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

---

8. The dissenting opinion assails this conclusion; however, in doing so it fails or refuses to appreciate the precise issue before this Court. Here, unlike in *Doe*, our focus is shifted to the interplay between §§ 6–203 and 6–204, rather than §§ 6–203 and 6–207. In *Doe*, we said that the signature requirement is mandatory; however, we never said anything about the quality of the signature, penmanship, or decipherability. Moreover, the statute under consideration, as written, does not set forth any express requirements as to quality, penmanship or legibility of a signature.

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

§ 6–203(a)—(b). The parties contest the meaning of § 6–203(a)(1) that directs a petition signer that he or she shall: "sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names."

Petitioner contends that a person's ordinary signature, notwithstanding illegibility, can satisfy § 6–203(a)(1). Specifically, Petitioner asserts that if the election authority is presented with printed information identifying the petition signer that is consistent with the information in the voter registration record, then § 6–203(b)(1) does not require rejection of the signature because of illegibility. The Board's misinterpretation of the statute, Petitioner argues, imposes a "penmanship"[9] requirement, thereby making the "signature" require-

---

9. Penmanship commonly means the "art, skill, style, or manner of handwriting." American Heritage Dictionary of the English Language (4th ed. 2006).

ment superfluous because the signature is required to "match" the printed name. Petitioner contends, further, that the Board's requirements nullify the purpose of the circulator's affidavit, which "is designed to assure the validity of the signatures." § 6–204(b). Additionally, Petitioner notes the absurdity of an interpretation whereby the Board will reject signatures identical, or nearly identical to those on file with the Board's voter registration records. Finally, Petitioner contends that the Board's interpretation does not prevent or enable detection of fraud.

Respondent counters, contending that the phrase "as it appears on the statewide voter registration list" means that the signature should be exactly as the printed name appears on the petition, i.e., that they should match. In basic terms, says Respondent, the Board cannot validate a signature it cannot read. The Board claims that it construed the Petition in strict compliance with § 6–203, as directed by this Court's interpretation of that provision as espoused in *Doe*, noting that there we stated, "the provisions [of § 6–203] are mandatory, not suggestive." *Doe*, 406 Md. at 728, 962 A.2d at 360. Moreover, the Respondent asserts that *Doe* compelled it to err on the side of exclusion, while prior to *Doe*, the Board had been more lenient and erred on the side of validation. Finally, Respondent maintains that it did not reject any signatures that were partially legible, only those it could not determine to be in compliance with § 6–203.[10]

Plainly, the overarching goal of the entire Petition Subtitle is to ensure that only eligible voters sign petitions, hence the requirement for identifying information including name and address, including zip code. We now hold that § 6–203(b)(1) directs the election authority to validate a petition signer's entry if there is sufficient cumulative information on

10. The summary of the bucketed signatures provided to this Court indicates that the Board rejected partially legible signatures. The bucketed categories included: "legible, full name ... legible, not full name ... partially legible, full name ... partially legible, not full name ... partially legible, discernible letters ... [and] illegible."

the face of the petition, e.g., a signature, a printed name, address, date of signing, and other information required by regulation, evidencing compliance with § 6–203(a), to determine the identity of the signer. The Board should not stop the validation process merely because the signature is itself illegible. If the signature field is illegible, as may often be the case, the election authority is able pursuant to § 6–203 and § 6–204 [11] to validate a signature and "ensure that the name of the individual who signed the petition is listed as a registered voter" pursuant to § 6–207.[12]

## A. *Doe v. Montgomery County Bd. of Elections*

In *Doe*, this Court was asked to address, among other things, whether there was error in the certification of a referendum petition that allegedly failed to carry the required number of signatures because of non-compliance with the signature requirements of § 6–203. *Doe*, 406 Md. at 704, 962

---

11. Section 6–204 of the Election Law Article states:

    **§ 6–204. Circulators; affidavit of the circulator.**

    (a) *In general.*—Each signature page shall contain an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed.

    (b) *Requirements.*—The affidavit shall contain the statements, required by regulation, designed to assure the validity of the signatures and the fairness of the petition process.

    (c) *Age of circulator.*—A circulator must be at least 18 years old at the time any of the signatures covered by the affidavit are affixed.

12. Section 6–207 of the Election Law Article states, in pertinent part:

    **§ 6–207. Verification of signatures.**

    (a) *In general.*—(1) Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures and count the validated signatures contained in the petition.

    (2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter.

    (b) *State Board to establish process.*—The State Board, by regulation, shall establish the process to be followed by all election authorities for verifying and counting signatures on petitions.

    Md.Code. (2003, 2010 Supp.) § 6–207(a)—(b) of the Election Law Article.

A.2d at 346. The trial judge in *Doe* held that § 6–203 was directory, not mandatory, and therefore "10,876 signatures challenged on the basis of alleged violations of § 6–203 [were] valid, because [the County Board] determined that all non-disqualified signatories were registered voters and residents of Montgomery County." First, he reasoned that because the validation and verification provisions, namely § 6–203 and § 6–207, when read together, created ambiguity about the meaning and purpose of validation under § 6–203, the statute did not require strict compliance. Moreover, the trial judge said that the responsibility of the Board under the statute was to ensure "only that signatories to the petition were registered voters and ... detecting cases of patent fraud." We held in *Doe* that the challenged signatures were invalid as a matter of law, reasoning that the trial judge had misconstrued § 6–203 to be directory based on his erroneous conclusion that § 6–203 and § 6–207 created ambiguity about the validation process. *Doe,* 406 Md. at 733, 962 A.2d at 363.

Subsequent to our decision in *Doe,* the State Board altered the manner in which it approached signature review on submitted petitions as evidenced by the revised "State of Maryland Petition Acceptance and Verification Procedures: Statewide or Public Local Law Referendum Petition." (Revised March 2009). According to the guidelines, the validator must first determine if the printed name matches the signature exactly. If not, the signature is invalidated. If the signature and the printed name match, the validator must consult a schedule of examples that show acceptable and unacceptable names.[13]

---

13. The Board's guidelines state in pertinent part that:
　　**2. NEW Procedure—Name determination—NEW Code**
　　　a. First determine if the printed name matches the signature exactly.
　　　i. If the signature and printed name do not match, invalidate the name
　　　ii. If the signature and printed name match, move on to the second step in name determination.
　　　b. If the name and signature match, determine if the name is acceptable under the following guidelines:

As reflected in the present case, the County Board, following the State Board's instructions, has put an unduly burdensome emphasis on the signature component of the petition entry, by requiring an exact "match" between a signature on the petition and printed name, as it appears on the voter registration list, all in the name of compliance with our decision in *Doe.*[14] *See Barnes,* 236 Md. at 573, 204 A.2d at 791–92 (noting that the legislation implementing the constitutional right to referendum must not be unduly burdensome on the

---

    i.   The name on the voter registration record is John Henry Smith
    1.   Accepted versions of the name on the petition
    a.   J. Henry Smith
    b.   John H. Smith
    c.   John Henry Smith
    2.   Unaccepted version of the name on the petition
    a.   John Smith
    b.   J. Smith
    c.   J.H. Smith
    d.   Henry Smith
    e.   H. Smith
    f.   Johnny Smith

"State of Maryland Petition Acceptance and Verification Procedures: Statewide or Public Local Law Referendum Petition" (Revised March 2009), (Pet.Ex.D). The guidelines do not specify if the "name" to be compared to the voter registration list is the printed or signed name, however, since the printed name must match the signature exactly, in the first step, it is reasonably inferred that the reviewer is directed to compare either to the record.

14. Prior decisions of this Court affirm that statutory requirements upon the referendum petition process are viable if not unduly burdensome on the constitutionally protected right to referendum. *Barnes, etc. v. State, ex rel. Pinkney,* 236 Md. 564, 573, 204 A.2d 787, 791–92 (1964). We have also consistently stated that constitutional and statutory provisions related to referendum petitions should be followed strictly. *See Takoma Pk. v. Citizens for Decent Gov't,* 301 Md. 439, 449–50, 483 A.2d 348, 354 (1984); *Gittings v. Bd. of Sup. of Elections,* 38 Md.App. 674, 679, 382 A.2d 349, 352 (1978); *Tyler v. Secretary of State,* 229 Md. 397, 402, 184 A.2d 101, 103–04 (1962). Additionally, election procedures are to be conducted with due regard to the intent of the voter. *Dutton v. Tawes,* 225 Md. 484, 495, 171 A.2d 688, 693 (1961) ("All of the cases turn fundamentally on whether the mistake in procedure has caused harm by misleading the electorate or by tending to prevent or frustrate an intelligent and full expression of the intent of the voters."). The State Board's guidelines, similarly, may not evade the requirement of reasonableness, they must not be unduly burdensome, and they should not frustrate the intent of the petition signer.

exercise of the right). The necessary inference from the Board's interpretation of § 6–203 is that the petitioning party would essentially be compelled to obtain a copy of the state-wide voter registration list and advise persons prior to signing the petition that they should consult the list and sign and print their name precisely as it appears on that list. Otherwise, the likelihood of certification would be very slim. There is no indication in the statute that this collateral process is required when exercising the right to referendum. The validation guidelines, excerpted *supra* in footnote 14, which the State Board revised subsequent to our decision in *Doe*, distort the purpose of § 6–203(a)(1) that is to provide one element among many that the Board must use to satisfy the requirements of validation.

## B. Legibility

Section 6–203(a)(1) does not address "legibility," or "penmanship," of the signature, and for the Board to impose such a strict requirement reaches beyond the scope of the statute.[15] In the instant case, the Board specifically rejected signatures based on varying degrees of illegibility. As noted in the Circuit Court's decision:

> The parties stipulate that the challenged, [not valid] signatures fall into six categories: a) **legible, full name**—the signature is legible, and includes all letters in their surname, one given name, and another name or initial. Total category signatures: **457;** b) **legible, not full name**—the signature is legible and includes all letters for the given name and one surname, but no additional name or initial. Total category signatures: **3,091;** c) **partially legible, full name**—the signature appears to include the signer's sur-

---

**15.** We note that other States have specifically addressed legibility in their election laws, but the Maryland General Assembly has not. *See* Alaska Stat. § 29.26.130(c) (2010) (stating "[i]llegible signatures shall be rejected by the clerk unless accompanied by a legible printed name."); Ariz.Rev.Stat. § 19–205(B.) (2010) (stating "[i]n the absence of a legible signature, the name as it is printed shall be the name used to determine the validity of the signature."); Utah Code Ann. § 20A–7–603(2)(g)(ii) (2010) (A printed name must be legible to be counted).

name, one given name, and one additional name or middle initial, but not all the letters in one or more of the names are discernible. Total category signatures: **851;** d) **partially legible, not full name**—the signature includes at least one name, though the letters in that name are not all discernible. Total category signatures: Total category signatures: **4,455;** e) **partially legible, discernible letters**—the signature includes some discernible letters. Total category signatures: Total category signatures: **3,456;** f) **illegible**—the signature includes no or virtually no discernible letters. Total category signatures: **2,977.**

The Circuit Court for Montgomery County held particularly that the County Board had not acted arbitrarily or capriciously in rejecting categories (e) and (f) *supra* reasoning that this Court's decision in *Doe* "certainly suggests that the Court of Appeals believes that indecipherable signatures ought to be disallowed without further consideration." To the contrary, our holding in *Doe* did not address "legibility," and we disavow that interpretation.

The printed or typed name, as we held in *Barnes*, was one piece of evidence, in addition to voter address and voter "precinct or district" that would be used to ensure "that only qualified persons have signed." *Barnes*, 236 Md. at 571–72, 204 A.2d at 791. Plainly the statutory description of a signature in § 6–203(a) is different than the statutory description under review in *Barnes*, however, the signature has not now become uniquely controlling. An illegible signature, therefore, is not dispositive within the validation process, but should be considered as part of the entire petition entry, that must be used to identify the individual signer under § 6–203.

## C. Sections 6–203 and 6–204—Validation

When read together, § 6–203 and § 6–204 are not ambiguous. Section 6–204 requires that every signature page of a petition include "an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed." The purpose of the circulator's attestation is to

"assure the validity of the signatures and the fairness of the petition process." § 6–204(b). This statutory provision for the affidavit of a circulator who attests under penalty of perjury that the signer affixed his or her information in the circulator's presence clearly addresses prevention of fraud in the petitioning process and is plainly intended to bolster the validity of the signature entries.

### D. Sections 6–203 and 6–207—Validation and Verification

■ As we held in *Doe*, when read together § 6–203 and § 6–207 are not ambiguous. *Doe*, 406 Md. at 731–32, 962 A.2d at 362–63. Plainly, the purpose of the signature requirement in § 6–203(a)(1) is to provide a personal attestation, as a signature is often used, to evidence support for the petition and to provide a unique identifier in conjunction with the printed name, address, date, and other information required by the State Board. The later information is used to subsequently verify the eligibility of the petition signer to support the petition. In *Barnes*, this Court said that the statutory requirements of the predecessor to § 6–203, Code (1964 Supp.), Article 33, § 169,[16] namely the "residence of each signer and the precinct or district wherein he is registered as a voter ... and below his signature his name ... either printed or typed ... pertain only to the *identification of the signer*." *Barnes*, 236 Md. at 571, 204 A.2d at 791 (emphasis added). Therefore, we restate our conclusion in *Barnes*, that the signature provided under § 6–203(a)(1) is but one of many

---

16. Code (1964 Supp.), Article 33, § 169, stated:

In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution [the Referendum], there shall be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer.

*Barnes*, 236 Md. at 569, 204 A.2d at 789–90 (noting that the "statutory provisions in respect of signatures to referendum petitions ... [were] originally enacted in 1941").

pieces of identifying information that the Board must assess to determine the validity of a petition entry.

Plainly, however, "[t]he purpose of signature verification under paragraph (1) of this subsection [§ 6–207] is to ensure that the name of the individual who signed the petition is listed as a registered voter." § 6–207(a)(2). Pursuant to § 6–207, the election authority must verify and count the validated signatures of persons that are listed as registered voters. Section 6–207(b) authorizes the State Board to "establish the process ... for verifying and counting signatures," but that authority does not permit the Board to impose any additional elements relating to validation under § 6–203, e.g., legibility of a signature. Here, when the Board was confronted with an illegible signature, it should have consulted the additional identifying information provided in accordance with § 6–203(a)(2), and then compared that information against the statewide voter registration list, instead of invalidating the entry. The signature alone, when reading §§ 6–203 and 6–207 together, is not meant to be dispositive on the issue of validity, because all the required information is used both to validate and then to verify in order that only eligible voters sign petitions. That is the goal of the validation and verification process.

HARRELL and BATTAGLIA, JJ., dissent.

HARRELL, J., dissenting, in which BATTAGLIA, J., joins.

Evolution blessed mankind with, among other beneficial features, opposable thumbs. Perfecting the use of our thumbs, modern descendants of the first Homo Sapiens, unlike other primates, are able to sign their names, in cursive, in a legible manner. This skill requires focus and practice, as the Nuns and others taught us. Today, the Majority opinion strikes a de-evolutionary blow by rewarding failure to put into practice that skill. From this day, our progeny will be able to measure the inevitable decline of our opposable thumbs into vestigial limbs. As a sign to our posterity that there were

among us those who sought to avert that result, Judge Battag-
lia and I dissent.

## I.

The Montgomery County Board of Elections ("the Board")
rejected 34,339 signatures on the petitions circulated and
submitted by or on behalf of the Montgomery County Volun-
teer Fire–Rescue Association ("the Association"). Of that
amount, 23,111 were for signature-related reasons. The Asso-
ciation challenged 15,287 of those 23,111 signatures, each of
which it placed, for purposes of appeal, into one of six catego-
ries or "buckets," reflecting varying degrees of legibility (or
illegibility). To prevail, the Association's task was to persuade
this Court to conclude that at least 12,395 of the 15,287
"signatures" were excluded improperly.

The Majority opinion, crowning with success the Associa-
tion's effort, replaces Title 6 of the Election Law Article with a
newly-formulated guideline, explained *infra.* Regrettably, the
Majority neglects to instruct the Board how to apply that
guideline. Mimicking minimalism, it states simply that, as
"conceded" by the Board at oral argument, if this Court
"agree[d] with the Association's interpretation of ... § 6–
203," we need not engage in "an independent review of the
'bucketed' signatures." Majority op. at 468, 15 A.3d at 801. It
does not explain, however, which contested signatures (or
"buckets" of signatures) should have been counted as legiti-
mate by the Board.[1]

## II.

The Majority opinion informs state election authorities that
a voter may "sign" a petition, under § 6–203, without provid-
ing a legible or discernible signature. A signature, it holds,
"is but one component ... to be considered in the validation

---

1. This oversight was foreseen by the Circuit Court for Montgomery
   County when it observed that "the questioned signatures need to be
   properly apportioned to show that one half of the total signatures
   required were submitted on or before August 4."

process...." Majority op. at 471, 15 A.3d at 802. This conclusion cuts against the clear language of the statute. *Doe v. Montgomery County Bd. of Elections*, 406 Md. 697, 712, 962 A.2d 342, 351 (2008) ("We begin our analysis by first looking to the normal, plain meaning of the language of the statute.... If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends.") (internal quotation marks and citations omitted).

The Majority prefaces its reasoning by noting that "our primary goal" in statutory interpretation is "always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision...." (Internal quotation marks and citation omitted). Judge Battaglia and I agree certainly with this principle. This does not give the Majority free rein, however, to look beyond the plain words of the statute, where those words are clear and unambiguous. Rather, when the Legislature says what it means, *i.e.*, what it intends, *see Dep't of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 668, 234 A.2d 255, 258 (1967) ("The legislative intent is to be sought in the first instance in the words used in the statute ....") (internal quotation marks and citation omitted), the Court is duty-bound to carry into effect "clear and unambiguous [statutory] language," "even if [we] might be of the opinion that the policy of the legislation is *unwise, or even harsh or unjust,* if no constitutional guarantees are impaired by the legislation." *Greyhound Corp.*, 247 Md. at 668–69, 234 A.2d at 258 (emphasis added) (internal quotation marks and citation omitted). As we shall demonstrate infra, the Majority opinion crafts its own version of what the law *should* be and, thereby, avoids a purported harsh result—the rejection of "authentic" signatures.

The pertinent provisions of § 6–203 state:

§ 6–203. Signers; information provided by signers

(a) In general.—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of

registration and at least one full given name and the initials of any other names; *and*

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) Validation and counting.—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page;  and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

§ 6–203 (emphasis added).

"To sign a petition," a voter must provide his or her handwritten signature in one of two specific ways. The voter may sign his or her name "as it appears on the statewide voter registration list," *"or"* the voter may sign his or her "surname of registration and at least one full given name and the initials of any other names." § 6–203(a)(1) (emphasis added). If the voter fails to do either, his or her signature should be invalidated under § 6–203(b)(1) ("The signature of an individual shall be validated and counted if ... the requirements of subsection (a) of this section have been satisfied."). An illegible handwritten signature is not compliant with the statute.

After today, however, a voter no longer need sign his or her name. Rather, a voter may provide a single illegible, indiscernible, unintelligible and otherwise meaningless mark, which may (or may not) be close to his or her actual signature. In effect, the Majority opinion has read the signature requirement out of the statute. It collapses the "handwritten signature" requirement of § 6–203(a)(1) and the "additional information" requirements of § 6–203(a)(2) into a totality of the circumstances test: § 6–203(b)(1) authorizes validation "if there is *sufficient cumulative information* on the face of the petition, e.g. a signature, a printed name, address, date of signing, and other information required by regulation...." Majority op. at 474, 15 A.3d at 804 (emphasis added). In doing so, the Majority articulates its desired statutory scheme, not that of the Legislature. At bottom, the General Assembly enumerated specific requirements, from which the voter is not free to pick and choose. That is especially true with the "handwritten signature"—a requirement which the Legislature placed first in the panoply, separate from the rest of the requirements.

The Majority is clear that, in its view, "[§] 6–203(a)(1) does not address legibility, or penmanship, of the signature, and for the Board to impose such a strict requirement reaches beyond the scope of the statute." Majority op. at 477, 15 A.3d at 806. We submit, however, that the Legislature would have not installed a "handwritten signature" requirement, which describes two detailed ways a voter may sign, unless it expected (*i.e.,* presumed) that the voter sign legibly.[2] The Majority opinion highlights also that "other States have specifically addressed legibility in their election laws, but the Maryland General Assembly has not." Majority op. at 477, 15 A.3d at

---

**2.** The Majority opinion does not suggest that the fulfillment of any other requirement in § 6–203 may be illegible, except for the "handwritten signature." The Legislature, however, required each provision of § 6–203 to be met by specific information provided in a specific way (*e.g.,* "printed or typed"). The Legislature did not omit, expressly or impliedly, the "handwritten signature" requirement from the same type of particularity or legibility.

806 n. 15 (citations omitted.) In this regard, we observe only that it was these States' legislatures, not their highest courts, which did so.

## III.

Not only does the Majority opinion's conclusion discount the clear language of the statute, it distances itself curiously from our quite recent opinion in *Doe.* In *Doe,* as in the present case, an interested group challenged a local law via referendum. To do so, the group's representatives acquired handwritten signatures on its petitions, some of which were challenged as "fail[ing] to mirror the voter's identity on the statewide voter registration list." *Doe,* 406 Md. at 709, 962 A.2d at 349. In validating the signatures, the trial court "determined that the signature provisions of [*§*] *6–203* were merely suggestive...." *Id.* The Majority opinion here acknowledges that we held in *Doe,* however, that the "signature requirements in subsection (a)(1) were mandatory...." Yet, the Majority here maintains that, in *Doe,* "[w]e were not asked to address .... whether a signature must be legible, when there is other information identifying the signer...." Majority op. at 470–71, 15 A.3d at 802–03.

The Majority opinion concludes that *Doe* led the State Board of Elections to "alter[ ] the manner in which it approached signature review...." Majority op. at 475, 15 A.3d at 805. Pursuant to new guidelines issued after the filing of *Doe,* the State Board of Elections demands an "exact[ ]" match between the handwritten signature and the printed name. Such an "exact 'match'" is not so required, the Majority holds, because "[t]he necessary inference ... is that the petitioning party would essentially be compelled to obtain a copy of the statewide voter registration list and advise persons prior to signing ... that they should consult the list and sign and print their name[s] precisely as [they] appear[ ] on that list." Majority op. at 476–78, 15 A.3d at 806–07. Thus, "[t]here is no indication in the statute that this collateral process is required

when exercising the right to referendum." Majority op. at 477, 15 A.3d at 806.

### A. *Doe* is Dispositive and Should not be Swept Aside.

We note initially that § 6–203(a)(2)(i)—the printed name requirement—was not at issue in *Doe;* rather, § 6–203(a)(1) was. The Court was not confronted with whether the handwritten signatures had to match the printed names; the question was whether the handwritten signatures had to "mirror the voter's identity on the statewide voter registration list." *Doe,* 406 Md. at 709, 962 A.2d at 349. In *Doe,* voters—who had two possible ways to "sign" the petition—chose the "as it appears on the . . . registration list" route and failed to comply. Those voters *could have* signed with their "surname of registration," etc. and, thereby, avoided most of the "mirroring" obligations, but they did not.

The present case raises the same issue as in *Doe.* As such, our conclusion in *Doe*—that the "*specific* signature requirements*" in § 6–203 are mandatory—should be dispositive of the present case. *Doe,* 406 Md. at 704, 962 A.2d at 346 (emphasis added) (quoting the relevant question presented). The primary shortcoming of the bucketed signatures, in the case *sub judice,* is *not* that voters failed to print their names exactly as they had signed it under § 6–203(a)(2)(i); it is that voters failed to sign legibly, so that the Board could not discern whether the signature (1) "mirror[ed]" the statewide voter registration list under § 6–203(a)(1) or, in the alternative, (2) fulfilled the tenets of the second manner of signing—"surname of registration," etc.

The Majority opinion acknowledges that the "[t]he parties contest the meaning of § 6–203(a)(1)," the signature requirement, as opposed to the "matching" requirement of § 6–203(a)(2)(i). Majority op. at 472, 15 A.3d at 803. In its Opposition to Petition for Writ of Certiorari in the present case, the Board clarified that it did not reject any signature unless it was illegible because then "it could not be discerned whether the person 'sign[ed their] name as it appears on the statewide voter registration list or the . . . surname of registration'," etc. (quoting § 6–203(a)(1)). Thus, the Circuit Court

opined that "[t]he voter must sign his name as it appears on the voter registration list. . . ."

For its part, the Association sought to make this case about the Board rejecting signatures which did not match printed names. The first step in the validation process is, no doubt, to examine "if the printed name matches the signature exactly." The second step, according to the Board's guidelines, however, asks whether the name mirrors the statewide voter registration list or is acceptable under part two of § 6–203(a)(1), "surname of registration," etc. In *either* case—if an election official finds that a signature does not match the printed name or that a signature does not fulfill the handwritten signature requirements—he or she must invalidate it using the *same* code, RS ("Registration Signature does not meet criteria"). Using this encompassing RS code, the Board rejected 22,447 signatures here. Even the Association recognized, in its Petition for Writ of Certiorari, that the printed names are relevant to the extent they represent "additional information" that "confirm[s]" the voters were "registered . . . in Montgomery County . . . and had executed their lawful, normal signatures." In other words, the Association hopes that the printed names mitigate the signatures' illegibility, rather than satisfy the matching requirement of § 6–203(a)(2)(i).

B. "Requirements" are Required.

Assuming *arguendo* that the primary focus should be on the matching of the handwritten signatures to the printed names, the Majority opinion remains flawed. In *Doe,* we held relevantly that "[t]he plain meaning of the words 'shall' and 'requirements' in [§] *6–203* reflect that . . . the provisions are mandatory, not suggestive." *Doe,* 406 Md. at 728, 962 A.2d at 360. As a result, "we decline[d] the invitation to reverse our past holding that a signer is required to comply with the signature requirements governing petitions for referendum." *Doe,* 406 Md. at 732–33, 962 A.2d at 363.

Among the signature requirements, to which we referred in *Doe,* is the mandate that a voter print his/her name "as it was

signed." § 6–203(a)(2)(i). As § 6–203(a)(1) instructs voters to sign in a specific way, their printed names should also appear in a specific way. Without a legible handwritten signature, election authorities are left unable to ascertain if voters fulfilled the printed name requirement. It must be fulfilled because voters are not free to pick and choose among the mandatory requirements of § 6–203.

C. The Majority Opinion's "Necessary Inference" is Unnecessary.

The Majority opinion bases its conclusion on the happening of an event which has not happened, *i.e.*, the institution of a collateral process whereby a "petitioning party would ... be compelled to obtain a copy of the statewide voter registration list and advise persons prior to signing the petition that they should consult the list and sign and print their name precisely as it appears on that list." Majority op. at 476–78, 15 A.3d at 806–07. Its concern for the development of such a process is fallacious, although perhaps a petition-gatherer would be wise to advise solicited voters that there are two ways of signing by hand, one of which entails the voter recalling how his or her name appears on the statewide voter registration list and the other requires much less recollective retention and should be executable by most.

As the trial court noted, the solution is as simple as instructing voters that " '[w]hen in doubt [as to your registration name], write your full name and sign your full name." After all, "he [or she] cannot err by inscribing more information than necessary." Perhaps that is why one Association petition solicitor achieved a signature-acceptance rate of 84 percent.

## IV.

The Majority opinion's conclusion also contradicts the Legislature's intent. The Majority opinion asserts that "the overarching goal of the entire Petition Subtitle is to ensure that only eligible voters sign petitions...." Majority op. at 473, 15 A.3d at 804. We disagree. The express goal of *§ 6–207* "is

to ensure that the name of the individual who signed the petition is listed as a registered voter." § 6–207(a)(2). The goal of § 6–203—the provision at issue in the present case—is related, but distinct. Its goal is to root out fraud and other irregularities.

Because the Majority opinion assumes the general purpose of Title 6 of the Election Law Article is to identify registered voters, it is able to conclude more easily that a handwritten signature is "but one component" to be considered. Majority op. at 471, 15 A.3d at 802. As such, "an illegible signature does not preclude validation." *Id.* The Majority reaches its holding—regarding the "but one component" description of the handwritten signature requirement—by relying upon *Barnes, etc. v. State, ex rel. Pinkney,* 236 Md. 564, 204 A.2d 787 (1964). *See* Majority op. at 480, 15 A.3d at 808 ("[W]e restate our conclusion in *Barnes* [ ] that the signature provided under § 6–203(a)(1) is but one of many pieces of identifying information that the Board must assess to determine the validity of a petition entry.")

*Barnes* considered the question of whether the Legislature could demand that each petition signer provide not just his or her handwritten signature, but also his or her address, precinct, and printed name. At the time the facts of *Barnes* occurred, some forty-seven years ago, the applicable statute read as follows:

> In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution, there shall be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer.

Maryland Code (1941, 1962 Repl. Vol, 1964 Supp.), Article 33, § 169.

At that time, the Maryland Constitution stated, however, that "no other verification shall be required," aside from the handwritten signature. MD. CONST. art. XVI, § 4 (amended 1976; 1982). We held that the additional requirements of § 169 did not conflict with the constitutional right to referenda

because they "pertain[ed] only to the identification of the signer." *Barnes*, 236 Md. at 571, 204 A.2d at 791 ("Clearly, the provisions of the [constitutional] Article will be furthered if ... a referendum petition is to be put upon the ballot only if it has the requisite number of genuine signature of *registered voters.")* (emphasis added).

The Majority opinion here concludes from *Barnes* that all the requirements outlined in § 6–203—from handwritten signature to additional information—exist for identification purposes solely. *See* Majority op. at 478, 15 A.3d at 807 ("An illegible signature ... should be considered as part of the *entire* petition entry, that must be used to *identify* the individual signer under § 6–203.") (emphasis added). According to the Majority, these requirements should be considered collectively.

Since *Barnes*, the Legislature enacted in 1998 the current version of the Election Law Article.[3] Where previously we noted a distinction between "identification" and "verification," the current statute equates the two. *See* § 6–207(a)(2) ("The purpose of signature verification ... is to ensure that the name of the individual who signed the petition is listed as a *registered voter.*") (emphasis added). Moreover, where the former statute in *Barnes* separated the "handwritten signature" requirement from the other information, the current statute requires that voters actually "sign" the petition by providing their signature *and* the additional information. Thus, the additional information is no longer merely for identification purposes; it is needed, in the first instance, to "sign" the petition, then for "validation," and ultimately for identification, or "verification." [4]

---

3. In anticipation of a comprehensive revision of the Election Code, the General Assembly authorized a Commission to Revise the Election Code. In its report, it mentioned how the revised Code was to include "substantive structural changes." REPORT OF THE COMMISSION TO REVISE THE ELECTION CODE 2 (1997)

4. We pause to question just what does the Majority opinion hold on this point? We said in *Barnes* that "legislation to implement the referendum provisions of the Constitution must be reasonable and must not place any undue burden on the exercise of that constitutional right."

The 1998 statutory changes underscore two important observations. First, the Majority opinion misses the mark when it equates signing and "validation" with identification, *i.e.*, it collapses the "validation" and "verification" processes, respectively. In § 6–203, the Legislature discusses the process of signing and "validation." At this stage, the General Assembly is concerned with rooting out fraud and other irregularities. For example, § 6–203(3)–(5) instruct validators to examine whether: (3) the voter has previously signed the same petition, (4) the circulator attests to the entry, and (5) the signature date is not later than the attestation date. *Compare Doe*, 406 Md. at 732, 962 A.2d at 363 ("The purpose of validation, relating to whether the signature is sufficient, is to 'provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected.'") (quoting *Barnes*, 236 Md. at 574, 204 A.2d at 793) *with id.* ("[T]he purpose of signature verification, relating to the existence of [the] *registration of the voter* and the signature count, is to 'ensure that the name of the individual who signed the petition is listed as a *registered voter.*'") (quoting § 6–207(a)(2)) (emphasis added).[5]

---

*Barnes, etc. v. State, ex rel. Pinkney*, 236 Md. 564, 573, 204 A.2d 787, 791–92 (1964). Even though the State Board's guidelines, in the present case, merely restate (nearly verbatim) the requirements of § 6–203, the Court appears to hold today that those guidelines, rather than § 6–203, impose an unreasonable and undue burden. *See* Majority op. at 476, 15 A.3d at 805–06 n. 14; *see also Dutton v. Tawes*, 225 Md. 484, 491, 171 A.2d 688, 690 (1961) ("Election officials of course should do what the law tells them to do....."); REPORT OF THE COMMISSION TO REVISE THE ELECTION CODE at 55 (reviewing the old *Barnes* statute, in preparation for the new 1998 version, and finding that "[m]any of the details of the petition format and process are [already] contained in the statute"); *see id.* at 2 (stating that the revised Code is to be characterized by "clarity, precision, consistence, conformity, completeness, and effectiveness...."). Perhaps the Majority meant to say that the statute itself, not the State Board's guidelines, is violative of *Barnes*?

5. The *Barnes* Court stated that the additional requirements help root out fraud, like the modern-day § 6–203. *See Barnes*, 236 Md. at 574, 204 A.2d at 793. *Barnes* also stated, however, that these additional requirements help identify the signer as a registered voter, like § 6–207. *See Barnes*, 236 Md. at 571, 204 A.2d at 791. *Barnes* was not internally

By assuming that the requirements in § 6–203 serve only the purpose associated with § 6–207, *i.e.*, identification or "verification," the Majority opinion is able to conclude that—to achieve adequately the goal of identification—the election authority, realistically speaking, does not need each piece of information required by § 6–203. Rather, just some pieces, taken together, may supply the election authority with enough to determine whether a voter is registered properly. Unfortunately, the Majority opinion overlooks the fact that the requirements of § 6–203 dictate how a voter actually "sign[s]" a petition in the first instance. The Legislature provided but one way to "sign a petition," and it required multiple pieces of information. To convey that information, legibility is no doubt an integral ingredient. The Majority overlooks also that § 6–203 serves an invaluable, independent purpose from § 6–207—to detect fraud and other irregularities, as opposed to confirm proper voter registration. Rather, the Majority would allow voters to bypass the Legislature's statutory safeguards.[6]

---

contradictory, but reflected how such additional information—*e.g.*, address and date of signing—is used for both purposes, an understanding the Legislature codified later in the current statute.

6. Section 6–203(a)(1) does not impose too heavy a burden for petition signers, who need only remember their first, middle, and last names. On this point, we find particularly persuasive the petitioner's brief in *Doe*.

Far from a "hypertechnical" burden, the signature requirement is a safeguard against fraud and abuse. The General Assembly did not state in the Election Code that purported signers are merely required to provide enough information for the [Board of Elections ("BOE")] to determine that a person bearing at least a similar name is registered. It demanded that more detailed information be provided than what the BOE relied upon here, which, frankly, is no more than could be pulled from a local telephone directory. Without the information the General Assembly wisely required, an overly-zealous petition circulator could simply leaf through a phonebook and sign for County residents using the name and address information provided. Based on the standards the BOE admits it applied, these "signatures" would all pass muster, even though only partial name information was provided, so long as there was overlap with some of the data in the voter registration list. The General Assembly's simple expedient of requiring signers to identify themselves by their full names and/or initials is an important safeguard against the fraud that can easily

Second, however one perceives the distinction between validation and verification, we glean from the 1998 enactment of the current statute additional evidence about the importance of the handwritten signature requirement. The statute in *Barnes* required only that voters sign their name, without specifying *how.* Presumably, therefore, less or no premium was placed on the legibility of that signature. In § 6–203(a)(1), the Legislature demanded more from a voter, instructing how he or she should sign his or her name. The Majority opinion eliminates this provision and, instead, resurrects and reinstates the *Barnes* statute, in direct contravention of the Legislature's present intent.

## V.

In enacting Title 6, the Legislature weighed the risk of authentic signatures being rejected against the value of rooting out fraud and deceit. The Legislature balanced also the benefit of ensuring registered voters are heard against the

---

occur in a referendum petition process. *See, e.g., Citizens Comm. for D.C. Video Lottery Terminal Initiative v. D.C. Bd. of Elections and Ethics,* 860 A.2d 813, 816 (D.C.2004) (describing circulator practice of forging names out of telephone directory); *In re Armentrout* [99 Ill.2d 242, 75 Ill.Dec. 703], 457 N.E.2d 1262, 1264–65 (Ill.1983) (describing "roundtabling" practice where [a] group of partisans take turns forging names from telephone directory on referendum petition). Indeed, here the court below saw fit to disqualify dozens of signatures that on their face "raise genuine suspicion about authenticity." These purported signatures, which included a number that appeared to have been made by the same hand, were particularly obvious and crude examples of suspicious signature entries. (E877) (circuit court finding that "[i]t's patent to me the same person filled every one of these [signature entries] out"). The BOE's decision to validate the many purported signatures that fail to comply with § 6–203(a)(1) removes an important safeguard against less easily detected manipulation of the referendum process.

Moreover, Maryland law is clear that referendum requirements cannot be jettisoned by boards of elections or petition sponsors simply because compliance poses some burden. "If the burden [of a referendum provision] is too heavy, the remedy is by an appropriate [legislative] amendment" to the provision, not simply by disregarding it. *Ferguson [v. Sec'y of State,* 249 Md. 510, 517, 240 A.2d, 232 236 (1968)].

Brief of Petitioner at 41–44 (footnote and some citations omitted).

cost of election authorities spending substantial time and money scrutinizing illegible signatures, trying to match them to records. Indeed, Board employees here devoted more than 3,000 hours, over 20 days, reviewing the petitions.[7] Today, this Court dons the cloak of a legislator to readjust these balances. Our job, however, is to say what the statutory law is, not what we wish it to be, even if we think that law "unwise," "harsh," and "unjust." *Greyhound Corp.*, 247 Md. at 668–69, 234 A.2d at 258 (emphasis added) (internal quotation marks and citation omitted).

The Majority opinion orders election authorities to disregard otherwise clear legislative instructions and instead conduct, for each petition entry, a painstaking analysis to compensate for failed penmanship. It does not instruct the election authorities, however, how much weight they should give each completed requirement, or what combination of requirements satisfies the statute, or if they must exhaust all identification efforts before invalidating a signature. How does a voter

---

7. The trial judge perceived keenly here that "given the less-favored nature of the referendum process," *see Ritchmount P'ship v. Bd. of Supervisors of Elections*, 283 Md. 48, 60 n. 8, 388 A.2d 523, 531 n. 8 (1978) ("Popular support for the direct legislation movement in the United States was short-lived, lasting only about 20 years (1898–1918) ....") (citation omitted); *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 456–57, 530 A.2d 245, 254 (1987) (quoting with approval an Attorney General opinion which concluded that "the broad language of the exception [in the Constitution]," exempting certain appropriation laws from referendum, was designed to forestall "the State serious financial embarrassment in the performance of its various essential functions") (internal quotation marks and citation omitted); *Tyler v. Sec'y of State*, 229 Md. 397, 402, 184 A.2d 101, 103–04 (1962) (observing that "[t]he exercise of the right of referendum is drastic in its effect" and, therefore, "the stringent [requirements] employed in Section 4 of [Article XVI of the Maryland Constitution] shows an intent that those seeking to exercise the right of referendum ... must ... strictly comply with the conditions prescribed") (citations omitted):

> It would be unreasonable ... to require [Board] employees to cross-check or investigate every illegible signature, which numbered here in the several thousands. Even the small cross-section of names supplied to the court by Montgomery County during argument demonstrates that such an examination could be inconclusive, because the original (and sometimes illegible) voter registration application did not appear to be similar to the petition signature.

"sign" a petition? After today, there is no clear answer. The Majority makes the individual requirements suggestive and, in the process, renders *Doe* a dead letter.[8]

I would affirm the judgment of the Circuit Court for Montgomery County.

Judge BATTAGLIA authorizes me to state that she joins the views expressed in this Dissent.

---

8. Our final word here is borrowed from the trial judge in the present litigation, who summarized our thoughts on the matter nicely.

In the court's view, it takes modest effort to sign a legible name. Many of us have sloppy penmanship because we write quickly or carelessly. [The Board's] counsel represented at argument that where the first letters of required names were discernible, the signature was counted. It is difficult to believe that the average person, with a modicum of effort, cannot impress upon a paper at least a rudimentary signature that would meet the statute's requirements. While not all of us have the talent to be calligraphers, surely most are able to sign legibly enough that a match with a printed name can be made.