44 A.3d 1002

**MARYLAND STATE BOARD OF ELECTIONS**

v.

**LIBERTARIAN PARTY OF MARYLAND, et al.**

No. 79, Sept. Term, 2011.

Court of Appeals of Maryland.

May 21, 2012.

Matthew J. Fader, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Kathleen E. Wherthey and Jeffrey L. Darsie, Asst. Attys. Gen., Baltimore, MD), on brief, for appellant/cross-appellee.

Mark A. Grannis (Jacinda A. Lanum of Wiltshire & Grannis LLP, Washington, DC; John A. Rego of Anderson & Quinn, LLC, Rockville, MD), on brief, for appellees/cross-appellants.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GREENE, J.

The Libertarian Party and the Green Party (collectively, Appellees) are political organizations within the State of Maryland. The Maryland State Board of Elections (Appellant) is an agency of the State of Maryland located in Anne Arundel County. Pursuant to Md.Code (2002, 2010 Repl.Vol.), § 4–102 of the Election Law Article,[1] Appellees qualified as new political parties and gained ballot access privileges by filing peti-

---

1. Unless otherwise noted, statutory references throughout are to the Election Law Article, Maryland Code (2002, 2010 Repl.Vol.).

tions with Appellant and by adopting interim constitutions and bylaws in accordance with the statute. Appellees, as political parties, enjoyed ballot access privileges from January 2007 until December 2010 when they were unable to show that their respective memberships consisted of at least 1% of registered Maryland voters or that their nominees for Governor of Maryland received at least 1% of the total vote.[2] In accordance with § 4–102, Appellees then undertook to obtain the required 10,000 petition signatures necessary to regain their ballot access privileges.[3] Upon review of the submitted petitions, and the signatures contained therein, Appellant determined that Appellees did not satisfy the statutory requirements. Specifically, Appellant determined that many of the submitted petition signatures were invalid under Md.Code (2002, 2010 Repl.Vol.), § 6–203 of the Election Law Article, as interpreted by this Court in *Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections*, 418 Md. 463, 15 A.3d 798 (2011) [hereinafter *Fire–Rescue* ].

As a result, Appellees filed a Complaint in the Circuit Court for Anne Arundel County seeking a declaratory judgment that Appellant incorrectly applied the law regarding validation of petition signatures and that the applicable law was whether there was "sufficient cumulative information," a phrase appearing in *Fire–Rescue*, from which Appellant could identify a signatory on a petition as a registered voter. Appellees subsequently filed a Motion for Summary Judgment, along with a Stipulation of Facts Not in Dispute signed by counsel for all parties. Appellant then filed a Cross–Motion for Summary Judgment. The trial judge granted Appellees' Motion for Summary Judgment, reasoning that the overriding consideration for Appellant to use in validating a petition signature is whether the identity of the signer can be verified. In his Order, the trial judge adopted Appellees' suggested

---

**2.** *See* Md.Code (2002, 2010 Repl.Vol.), § 4–103(a)(2) of the Election Law Article.

**3.** *See* Md.Code (2002, 2010 Repl.Vol.), § 4–102(b)(2)(i) of the Election Law Article.

"sufficient cumulative information" standard and declared that: the sufficient cumulative information standard forbids invalidating a petition entry merely because a signer omits an unused first or middle name; the sufficient cumulative information standard forbids invalidating a petition entry for name-related defects if, through other information contained in the entry, the signer's identity can be corroborated; and no signature should be considered a duplicate unless a signature from the same voter has been previously validated.

Appellant noted an appeal to the Court of Special Appeals and Appellees noted a cross-appeal; prior to any proceedings in the intermediate appellate court, this Court issued a writ of *certiorari* to consider both the appeal and the cross-appeal. *Md. Bd. of Elections v. Libertarian Party*, 422 Md. 353, 30 A.3d 193 (2011). The following questions are posed by Appellant:

1. Do [the Maryland State Board of Elections's] current standards for reviewing and validating petition signatures, as revised to reflect this Court's recent ruling in *Fire–Rescue*, appropriately implement the requirements of Section 6–203 of the Election Law Article ("EL") of the Annotated Code of Maryland as interpreted in *Fire–Rescue?*

2. Does the signature validation standard articulated in *Fire–Rescue* apply uniformly to validation of petition signatures both in the referendum context, and in other contexts including new party petitions?

3. Does the [Maryland State Board of Elections] appropriately refuse to validate duplicate or multiple signatures of persons who already have signed a petition?

Appellees present the following additional question for this Court to address:

Did the Circuit Court err in holding that the "sufficient cumulative information" standard permits the invalidation of a signature on a ballot access petition by a person the [Maryland] State Board [of Elections] has identified as a registered voter, merely because the signer uses a nickname?

We shall hold that this Court's interpretation in *Doe v. Montgomery Cnty. Bd. of Elections,* 406 Md. 697, 962 A.2d 342 (2008), of the mandatory signature requirements of § 6–203(a) was affirmed in *Fire–Rescue.* The trial court and Appellees misconstrue the reasoning of *Fire–Rescue* in concluding that the "sufficient cumulative information" language established a new standard to utilize in petition signature validation; rather, this Court has consistently held that the requirements for petition signatures under § 6–203(a) are mandatory. We, therefore, reject any arguments made by Appellees in reliance on a supposed "sufficient cumulative information" standard. Furthermore, we hold that the petition signature validation requirements provided in § 6–203 of the Election Law Article apply to petitions in both the referendum context and in the context of new party petitions. To the extent that Appellees raise constitutional claims related to this issue, we decline to address those claims for reasons discussed more fully below. Lastly, we hold that, in accordance with the plain and unambiguous language of § 6–203(b), Appellant appropriately refused to validate and count duplicate signatures of individuals who previously signed the same petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Md.Code (2002, 2010 Repl.Vol.), § 4–102 of the Election Law Article provides that any group of registered voters may form a new political party by filing a petition with the State Board of Elections and adopting and filing an interim constitution and bylaws. In accordance with Md.Code (2002, 2010 Repl.Vol.), § 4–103 of the Election Law Article, "a new political party shall retain its status as a political party until December 31 in the year of the second statewide general election following the party's qualification under § 4–102," unless the political party status is extended by fulfilling either of two conditions. The first condition is nominating a candidate for the highest office on a ballot in a statewide general election and obtaining at least 1% of the total vote for that office in favor of the nominated candidate. *See* Md.Code (2002, 2010 Repl.Vol.), § 4–103(a)(2)(i) of the Election Law

Article. The second condition is affiliation of at least 1 % of the State's registered voters with the political party. *See* Md.Code (2002, 2010 Repl.Vol.), § 4–103(a)(2)(ii) of the Election Law Article. If a political party is unable to satisfy either of those conditions, it may re-apply for status as a new political party by once again filing with the State Board of Elections a petition, satisfying the necessary statutory requirements, as well as an interim constitution and bylaws. *See* Md.Code (2002, 2010 Repl.Vol.), § 4–103(c) of the Election Law Article. Section 4–102(b) lists the requirements for the petition:

(1) The petition shall state:

(i) the partisan organization's intent to organize a State political party;

(ii) the name of the partisan organization;

(iii) the name and signature of the State chairman of the partisan organization; and

(iv) the names and addresses of 25 registered voters, including the State chairman, who shall be designated as constituting the initial governing body of the partisan organization.

(2)(i) Appended to the petition shall be papers bearing the signatures of at least 10,000 registered voters who are eligible to vote in the State as of the first day of the month in which the petition is submitted.

(ii) Signatures on the petition must have been affixed to the petition not more than 2 years before the filing date of the last qualifying signature.

Appellees fulfilled the requirements to become new political parties from January 2007 until December 2010; after December 2010, however, they no longer satisfied the conditions under § 4–103(a)(2)(i) or (ii) to retain their statuses as political parties, as explained herein. Appellees then sought to regain their political party statuses by each collecting 10,000 petition signatures of registered voters in the State of Maryland, as required under § 4–102(b)(2)(i). On March 7, 2011, Appellees submitted, and Appellant accepted, a petition on behalf of the

Libertarian Party that purported to contain 13,787 signatures, as well as a petition on behalf of the Green Party that purported to contain 14,842 signatures. On March 16, 2011, Appellees submitted, and Appellant accepted, additional petition pages on behalf of the Libertarian Party that purported to contain an additional 1,068 signatures.

Title 6 of the Election Law Article provides a two-step process, involving validation and verification, for counting signatures on a petition. The signature validation procedure is outlined in Md.Code (2002, 2010 Repl.Vol.), § 6–203(a) of the Election Law Article:

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

The signature verification procedure is outlined in Md.Code (2002, 2010 Repl.Vol.), § 6–207 of the Election Law Article:

(a) *In general.*—(1) Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to verify the signatures and count the validated signatures contained in the petition.

(2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter.

(b) *State Board to establish process.*—The State Board, by regulation, shall establish the process to be followed by all election authorities for verifying and counting signatures on petitions.

Md.Code (2002, 2010 Repl.Vol.), § 6–103(a) of the Election Law Article provides:

(1) The State Board shall adopt regulations, consistent with this title, to carry out the provisions of this title.

(2) The regulations shall:

(i) prescribe the form and content of petitions;

(ii) specify procedures for the circulation of petitions for signatures;

(iii) specify procedures for the verification and counting of signatures; and

(iv) provide any other procedural or technical require-ments that the State Board considers appropriate.

Accordingly, Appellant devised guidelines to determine wheth-er the signatures on the respective petitions submitted by Appellees should be validated and verified.[4] After concluding

---

4. As explained in greater detail in the Stipulation of Facts Not in Dispute, Appellant devised and implemented several sets of guidelines throughout the process of validating, verifying, and counting the peti-

the processes of validation and verification, Appellant made the determination that the petitions contained an insufficient number of signatures, and it notified Appellees that they did not qualify to regain their statuses as political parties.

On April 11, 2011, Appellees filed a Complaint against Appellant in the Circuit Court for Anne Arundel County,[5] pursuant to Md.Code (2002, 2010 Repl.Vol.), § 6–209 of the Election Law Article. In the Complaint, Appellees contended that Appellant improperly determined that the petitions submitted by Appellees were insufficient to satisfy the 10,000 signature requirement. Appellees claimed that, pursuant to this Court's opinion in *Fire–Rescue,* the correct standard for Appellant to apply when validating signatures on a petition is the "sufficient cumulative information" standard. According to Appellees, under that standard, a signature should be validated if there is sufficient cumulative information to identify the signer. Appellees characterized Appellant's review of the petitions as a " 'single elimination' review, aimed not at evaluating the totality of each petition signature but at invalidating a signature as soon as even a single flaw [was] discovered." Appellees cited several examples of instances where they claimed Appellant had erroneously invalidated petition signatures. Of particular relevance to the issues before this Court, Appellees claimed that Appellant erroneously invalidated petition entries "where a signature and a printed name both omitted an initial or an unused first or middle name[.]"

---

tion entries submitted by Appellees. Appellant had in place one set of guidelines before we issued our opinion in *Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections,* 418 Md. 463, 15 A.3d 798 (2011). In response to our Per Curiam Order in *Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections,* 416 Md. 73, 5 A.3d 683 (2010), but before the full opinion was issued, Appellant revised its guidelines in light of what it perceived our holding would be. Finally, once we issued our opinion in *Fire–Rescue,* Appellant again revised or modified its guidelines in an attempt to comply with our holding in that case.

**5.** Appellees also named as a defendant in their Complaint Linda Lamone, Administrator of the Maryland State Board of Elections. Ms. Lamone is not a party before this Court, so we need not, and do not, include her in our discussion.

In addition, Appellees asserted that Appellant erred when it invalidated entries in which a signer used a nickname rather than a given name. Lastly, Appellees maintained that Appellant acted improperly when it "instructed the local boards to reject (and code as "DUP" [6]) any signature by a voter whose signature had already been examined once—even if the first signature was invalidated."

In their Complaint, Appellees sought declaratory and injunctive relief:

41. As to Count One, the plaintiffs seek a declaratory judgment that (a) the defendants incorrectly applied the applicable law in validating the plaintiffs' petition signatures; and (b) that the plaintiffs were and are entitled to have their petitions validated under the "sufficient cumulative information" standard articulated by the Court of Appeals in *Fire–Rescue Association.*

42. As to Count One, the plaintiffs further seek a declaratory judgment (a) that the "sufficient cumulative information" standard forbids the invalidation of petition entries for defects found in printed names if the missing elements are supplied by the corresponding signed names, or vice versa; (b) that the "sufficient cumulative information" standard forbids the invalidation of petition entries merely because the signer omits an used first or middle name, or uses a nickname, when writing his or her full name or signature; (c) that the "sufficient cumulative information" standard forbids the invalidation of petition entries for name-related defects if the entry contains address or birthdate information from which the signer's identity can be corroborated; (d) that no signature should be considered a "duplicate" unless a signature from the same voter has previously been *validated;* (e) that state law does not require a petition circulator's printed name to match his or her signed name; (f) that state law does not require a petition circulator to adhere to any prescribed form or level of completeness in

---

**6.** The most recent guidelines established by Appellant define the code "DUP" as "Duplicate Name—signed this petition more than once[.]"

the way his or her name is printed or signed; and (g) that no page of a new party petition using a state-approved form, even if that form has been superseded, should be considered invalid unless there is some reason to believe the use of the superseded form could actually cause voter confusion.

43. As to Count One, the plaintiffs request that this Court order the defendants to review plaintiffs' petitions under the proper legal standard, and (a) to enlarge the number of validated signatures credited to each plaintiff's petition to whatever extent can be agreed upon by the parties or proven by the evidence in court; and (b) to determine, in the event that either plaintiff reaches 10,000 properly validated signatures, that the petition has succeeded and that plaintiff is entitled to be re-recognized as a ballot-eligible political party in Maryland.

Appellees subsequently filed a Motion for Summary Judgment or Partial Summary Judgment, and Appellant filed a Cross–Motion for Summary Judgment and for a Declaratory Ruling in Favor of Defendants. Appellant and Appellees also filed a Stipulation of Facts Not in Dispute, which contained the following relevant facts:

1. Plaintiff Libertarian Party of Maryland ("Libertarian Party") is a political organization with whom 9,282 registered voters in Maryland have chosen to affiliate (as of February 28, 2011).

2. Plaintiff Maryland Green Party ("Green Party") is a political organization with whom 8,457 registered voters in Maryland have chosen to affiliate (as of February 28, 2011).

3. Defendant Maryland State Board of Elections is an agency of the State of Maryland. Defendant is charged with, among other things, verifying and validating signatures on petitions submitted by organizations seeking to qualify as new political parties (or renew their status as "recognized" or ballot-eligible political parties). The Maryland State Board of Elections is located in Anne Arundel County.

\* \* \*

5. The Libertarian Party and the Green Party each enjoyed ballot access privileges during the last four years, having most recently renewed their party status with the state in January 2007. However, during the 2010 Gubernatorial General Election, neither plaintiff's nominee for Governor of Maryland received more than the approximately 18,579 votes (1% of the total votes cast for governor) necessary to retain the party's status as a political party.

6. On March 7, 2011, the State Board accepted a petition on behalf of the Libertarian Party that purported to contain 13,787 signatures, as well as a petition on behalf of the Green Party that purported to contain 14,842 signatures. On March 16, 2011, the State Board accepted additional petition pages on behalf of the Libertarian party that purported to contain an additional 1,068 signatures.

7. On or about March 9, 2011, the defendants promulgated the "State of Maryland Petition Acceptance and Verification Procedures[.]" At that time, the State Board anticipated that an opinion by the Maryland Court of Appeals in *Montgomery County Volunteer Fire–Rescue Ass'n v. Montgomery County Bd. of Elections* [418 Md. 463, 15 A.3d 798], 2011 WL 977590 (Md., March 22, 2011) (*"Fire–Rescue"*) might require some modification of the State Board's petition signature verification guidelines or other processes. Accordingly, the defendants' revised guidelines included a new code ("Signature Standard—SS") for use by elections officials in marking certain petition signatures that the State Board thought might be affected by the *Fire–Rescue* opinion.

8. On March 22, 2011, while the signatures submitted by the plaintiffs were being validated by state and local election officials using the March 9, 2011 SBE Guidelines, the Maryland Court of Appeals released its opinion in *Fire–Rescue.* In light of the additional guidance provided by the *Fire–Rescue* opinion, the State Board began a further revision of its petition acceptance and verification procedures, which were not completed and finalized until on or about May 5, 2011.... However, because processing of the petitions had

already begun using the March 9, 2011 SBE Guidelines and because elections officials are required by statute to complete the verification and counting of petitions within 20 days, the State Board made its determination as to the sufficiency of the petitions using the March 9, 2011 SBE Guidelines.

9. On March 31, 2011, the defendants determined that the majority of the signatures submitted by the Libertarian Party in support of its petition were invalid and could not be counted toward the 10,000 signature minimum set by state law. The Libertarian Party was credited with 3,815 signatures (25.44%) that were considered valid under the State Board's pre-*Fire–Rescue* understanding of the applicable standards, plus 2,417 signatures that had been coded "SS" and were considered valid under *Fire–Rescue*. The remaining 8,762 signatures—nearly 60% of the signatures processed—were invalidated.

10. Also on March 31, 2011, the defendants determined that the majority of the signatures submitted by the Green Party in support of its petition were invalid and could not be counted toward the 10,000 signature minimum set by state law. The Green Party was credited with 3,928 signatures (26.39%) that were considered valid under the State Board's pre–*Fire–Rescue* understanding of the applicable standards, plus 1,977 signatures that had been coded "SS" and were considered valid under *Fire–Rescue*. The remaining 8,981 signatures—over 60% of the signatures processed—were invalidated.

11. In the weeks since March 31, [2011,] thanks to constructive discussions between the parties, the State Board has credited each party with additional signatures, mainly falling into the categories described in paragraph[s] 30 and 31 of the complaint.[7] Specifically, the defendants have re-

---

**7.** Paragraphs 30 and 31 of the Complaint contained the following factual allegations:

30. In some cases, the SBE Guidelines incorrectly led to the invalidation of entire pages of signatures. For example, a "CI" code (for

processed approximately 1,040 signatures originally rejected for the reasons described in paragraphs 30 and 31 of the complaint, and have found approximately 358 to be valid. As a result of these discussions, as of May 5, [2011,] the total signatures credited to each party had risen to 6,583 for the Libertarian Party and 5,919 for the Green Party.

12. During both the original validation process and the reprocessing that has occurred since March 31, [2011,] state and local election officials searched the state's "MDVO-TERS" database for every person who could be identified from the information appearing on the face of the Libertarian Party and Green Party petitions. Many signatures could not be matched to a registered voter in the state's database. However, Exhibits C and D to this stipulation list all the voters who could be identified as having signed in support of the Libertarian Party's petition (Exhibit C) and the Green Party's petition (Exhibit D). Exhibits C and D are com-

---

"circulator issue") was assigned to *every signature* that appeared on a page submitted by a signature collector or "circulator" whose printed name and signed name did not match. But nothing in the Election Law [Article] requires a circulator's signature to match his [or her] printed name. Thus, the defendants' improper use of this "CI" code, even on a relatively small number of petition pages, ultimately invalidated 382 signatures submitted by the Libertarian Party and 136 signatures submitted by the Green Party.

31. Likewise, the SBE Guidelines required a "PF" code (for "petition format issue") to be assigned to *every signature* that appeared on a page that did not comply with the state's rules on petition format. But while the statutory requirements for petition format are minimal, the SBE Guidelines required the invalidation of entire pages if they did not contain a "notice to signers" composed by the defendants. Approximately 806 Libertarian Party and 15 Green Party signatures were invalidated under the "PF" code, and in many of these cases the problem appears to have been that the petition used a "notice to signers" that had since been revised by the state. The revision to the "notice to signers" had nothing to do with the plaintiffs or this specific petition; it simply set forth the new, tougher rules the defendants would be applying when they reviewed the signatures. No state law requires that the same form be used for all pages of a petition. Furthermore, the use of the older state-approved language instead of the newer state-approved language does not provide any basis for invalidating—without review—signatures that met the defendants' newer and tougher standards anyway.

plete and accurate printouts of the information the State Board exported from its MDVOTERS database on or about May 11, 2011.

13. Exhibit C contains approximately 12,203 lines of voter names. Subtracting duplicates, Exhibit C contains the names of over 12,000 unique registered voters.

14. Exhibit D contains approximately 13,454 lines of voter names. Subtracting duplicates, Exhibit D contains the names of over 12,950 unique registered voters.

15. As of May 3, 2011, the State Board considered approximately 5,131 signatures on the Libertarian Party petition and approximately 6,583 signatures on the Green Party petition to be invalid because of defects in the printed name that the State Board had coded "RS" (a code that indicates the signature is invalid and does not count toward the required 10,000 signatures). The State Board agrees with the plaintiffs that some of the remaining "RS" signatures (those described in paragraph 42(a) of the complaint [8]) should be considered valid under *Fire–Rescue*, but these have not yet been re-processed. The plaintiffs estimate that the Libertarian Party could expect to gain between 820 and 925 signatures from re-processing these "42(a)" signatures, and the Green Party could expect to gain between 1,050 and 1,183 [signatures]. The State Board has no official estimate of how many valid signatures each party is likely to gain from the validation of signatures described in paragraph 42(a), but agrees with the plaintiffs that it appears highly unlikely that either party could meet the 10,000 signature requirement with those signatures alone.

16. According to Exhibits C and D, approximately 95 signatures on the Libertarian Party petition and approximately 413 signatures on the Green Party petition are currently considered invalid because they were considered

---

**8.** Paragraph 42(a) of the Complaint states: "As to Count One, the plaintiffs further seek a declaratory judgment (a) that the 'sufficient cumulative information' standard forbids the invalidation of petition entries for defects found in printed names if the missing elements are supplied by the corresponding signed names, or vice versa[.]"

to be duplicate signatures. The defendants instructed the local boards to reject (and code as "DUP") any signature by a voter whose signature had already been examined once—even if the first signature was invalidated.

17. The plaintiffs are permitted to submit additional signatures in support of their petitions at any time subject to the requirements of COMAR § 33.06.04.05.[9] However, under current procedures, the prohibition on "duplicate" signatures applies to all additional signature pages which are part of the same petition, so that once an individual has had a signature entry processed, whether that entry was accepted or rejected, any other effort to sign that petition is rejected as a "duplicate" entry.

Following a hearing on June 21, 2011, the trial judge granted Appellees' Motion for Summary Judgment, concluding that the invalidations made by Appellant were improper. The trial judge indicated that "the overriding consideration is whether the signer can be identified as the registered voter." The trial judge's Order stated, in relevant part, that it was:

> **ORDERED** and Declared, that the "sufficient cumulative information" standard forbids the invalidation of petition entries merely because the signer omits an unused first or middle name, when writing his or her full name or signature; and it is further

---

9. COMAR § 33.06.04.05 provides:

**Acceptance—Supplemental Filing.**

A. In General. If, on verification of names, a petition is found to have an insufficient number of valid names, supplemental signature pages, together with an amended information page, may be submitted before the application deadline, as provided in Election Law Article, § 6–205(d), Annotated Code of Maryland.

B. Limitations. The supplemental signature pages may not be accepted for filing unless:

(1) For a petition subject to Regulation .07 of this chapter, the filing is accompanied by the required petition fund statement; and

(2) The amended information page indicates that the supplemental filing:

(a) Satisfies all requirements for the time of signing and filing, and

(b) Brings the total number of signatures on the petition to the required number.

**ORDERED** and Declared, that the "sufficient cumulative information" standard forbids the invalidation of petition entries for name-related defects if the entry contains address or birthdate information from which the signer's identity can be corroborated; and it is further

**ORDERED** and [D]eclared, that no signature should be considered a "duplicate" unless a signature from the same voter has previously been validated.

## STANDARD OF REVIEW

This Court has discussed review of a trial judge's grant of summary judgment in the following relevant way:

Pursuant to Maryland Rule 2–501, we have stated that "[a] trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City,* 413 Md. 309, 329, 992 A.2d 459, 471 (2010) (internal quotation omitted). A determination of "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of College Park,* 415 Md. 475, 498, 3 A.3d 421, 434 (2010); *Conaway v. Deane,* 401 Md. 219, 243, 932 A.2d 571, 584 (2007); *Charles Cnty. Comm'rs v. Johnson,* 393 Md. 248, 263, 900 A.2d 753, 762 (2006). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is de novo, that is, whether the trial court's legal conclusions were legally correct." *Messing v. Bank of Am., N.A.,* 373 Md. 672, 684, 821 A.2d 22, 28 (2003) (citations omitted).

On review of an order granting summary judgment, our analysis "begins with the determination [of] whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law." *Appiah v. Hall,* 416 Md. 533, 546, 7 A.3d 536, 544 (2010) (citing *O'Connor v. Balt. Cnty.,* 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004)). Our review of the record is independent "to

determine whether the parties properly generated a dispute of material fact. . . ." *Charles Cnty. Comm'rs,* 393 Md. at 263, 900 A.2d at 762. The record is reviewed "in the light most favorable to the nonmoving party and [we] construe any reasonable inferences that may be drawn from the well-pled facts against the moving party." *Muskin v. State Dep't of Assessments & Taxation,* 422 Md. 544, 554–55, 30 A.3d 962, 968 (2011); *Conaway,* 401 Md. at 243, 932 A.2d at 585; *O'Connor,* 382 Md. at 111, 854 A.2d at 1196; *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001). With regard to whether a fact is material, this Court has stated, "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *O'Connor,* 382 Md. at 111, 854 A.2d at 1196 (quoting *Lippert v. Jung,* 366 Md. 221, 227, 783 A.2d 206, 209 (2001)). In other words, a material fact is a fact "necessary to resolve the controversy as a matter of law[.]" *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974). If it is determined that no genuine dispute of material fact exists, "we review the trial court's ruling on the law, considering the same material from the record and deciding the same legal issues as the circuit court." *Messing,* 373 Md. at 684, 821 A.2d at 28 (citation omitted); *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (holding that "[i]f no material facts are placed in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law" (citations omitted)). In conducting our review of a grant of a motion for summary judgment, we consider "only the grounds upon which the trial court relied in granting summary judgment." *River Walk Apartments, LLC v. Twigg,* 396 Md. 527, 541–42, 914 A.2d 770, 779 (2007) (quoting *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006)).

*D'Aoust v. Diamond,* 424 Md. 549, 574–75, 36 A.3d 941, 955–56 (2012).

Based upon the extensive factual stipulations presented to the trial judge with the cross-motions for summary judgment, we conclude that there were no material facts in dispute. Therefore, we evaluate whether the trial judge correctly granted summary judgment in favor of Appellees as a matter of law. As discussed in further detail below, the trial judge incorrectly interpreted the applicable law in this case. Therefore, the entry of summary judgment in favor of Appellees was improper and should be vacated.

## DISCUSSION

### I. Requirements of § 6–203

In granting Appellees' Motion for Summary Judgment, the trial judge concluded that the appropriate standard for Appellant to use when validating and counting petition signatures is the "sufficient cumulative information" standard, which the judge determined was announced in *Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections*, 418 Md. 463, 15 A.3d 798 (2011). The trial court and Appellees misconstrue this Court's analysis in *Fire–Rescue* by asserting that there is a "sufficient cumulative information" standard applicable to validation of petition signatures under § 6–203(a). Rather, only in the context of discussing legibility of petition signatures, we stated that "§ 6–203(b)(1) directs the election authority to validate a petition signer's entry if there is sufficient cumulative information on the face of the petition, e.g., a signature, a printed name, address, date of signing, and other information required by regulation, *evidencing compliance with § 6–203(a)*, to determine the identity of the signer." *Fire–Rescue*, 418 Md. at 473–74, 15 A.3d at 804 (emphasis added). Our interpretation in *Fire–Rescue* of the provisions of § 6–203 is consistent with our prior analysis of the statute in *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 962 A.2d 342 (2008), wherein we indicated that the requirements of § 6–203(a) are mandatory. Thus, we hold that Appellant correctly implemented the mandates of § 6–203(a), as interpreted in *Doe* and affirmed in *Fire–Rescue*, and

the trial court improperly granted summary judgment in favor of Appellees.

In *Doe*, this Court addressed the issue of "whether the Montgomery County Board of Elections ('County Board') properly certified a petition for referendum proffered by the Maryland Citizens for Responsible Government ('Citizens Group') who sought to use the referendum process to overturn Bill No. 23–07, enacted by the Montgomery County Council and signed by the County Executive, which would add 'gender identity' as a protected characteristic under the County's anti-discrimination laws." *Doe*, 406 Md. at 702, 962 A.2d at 344–45 (footnotes omitted). After the petition had been certified for the election ballot, several citizens in Montgomery County filed a Complaint, challenging the validity of the petition and seeking a declaratory judgment. *Doe*, 406 Md. at 702–03, 962 A.2d at 345. After considering the parties' cross-motions for summary judgment, the trial judge granted the County Board's Motion for Summary Judgment, concluding, *inter alia*, that the plaintiffs had failed to file timely their Complaint and that the provisions of § 6–203 were merely suggestive as opposed to mandatory. *Doe*, 406 Md. at 708–09, 962 A.2d at 348–49.

Of particular relevance to the issues in the instant case, on review in *Doe*, we interpreted the statutory requirements of § 6–203(a). The statute provides, in relevant part:

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the state-wide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

We determined in our interpretation of § 6–203 that the words "shall" and "requirements" reflected a mandatory directive that the signer must comply with all of the provisions of the statute. *Doe,* 406 Md. at 728, 962 A.2d at 360. We noted that in *Barnes v. State ex rel. Pinkney,* 236 Md. 564, 204 A.2d 787 (1964), we considered whether the signature requirements set forth in Section 169, Article 33, Maryland Code (1957, 1964 Supp.), the precursor to § 6–203, were suggestive or mandatory. *Doe,* 406 Md. at 729–30, 962 A.2d at 361. In *Barnes,* we concluded that the statutory signature provisions were mandatory and that the purpose of those provisions was to ensure that fraudulent or improper signatures could be detected and to facilitate the review of signatures by interested persons. *Barnes,* 236 Md. at 571–72, 574, 204 A.2d at 791, 793. We noted in *Doe* that, although the signature provisions discussed in *Barnes* had been amended, those amendments did not reflect an intention by the Legislature to overrule the standard articulated by this Court in *Barnes;* rather, if the Legislature had intended to overrule this Court's interpretation in *Barnes* of the relevant statutory provisions, it could

have replaced the word "shall." *Doe,* 406 Md. at 730–31 n. 24, 962 A.2d at 361–62 n. 24. We also discussed the separate procedures of validating and verifying signatures, stating that "[t]he purpose of validation, relating to whether the signature is sufficient, is to provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected, while the purpose of signature verification, relating to the existence of registration of the voter and the signature count, is to ensure that the name of the individual who signed the petition is listed as a registered voter." *Doe,* 406 Md. at 732, 962 A.2d at 362–63 (internal citations and quotations omitted).

Several years after *Doe,* this Court decided *Fire–Rescue.*[10] In *Fire–Rescue,* the Montgomery County Council signed into law a bill that established an emergency services transport fee. *Fire–Rescue,* 418 Md. at 466, 15 A.3d at 799–800. The Fire–Rescue Association thereafter sponsored a petition to challenge the bill through referendum. *Fire–Rescue,* 418 Md. at 466, 15 A.3d at 800. Following the Association's submission of petition entries, the County Board decided not to certify the petition because it did not contain the requisite number of valid signatures. *Fire–Rescue,* 418 Md. at 467, 15 A.3d at 800. The Association filed a Complaint for declaratory relief, challenging the County Board's refusal to certify the petition and place the referendum issue on the ballot. *Id.* In its Complaint, the Association objected to the Board's rejection of many entries based on legibility issues with the signatures in

----

10. We issued a Per Curiam Order on September 29, 2010, stating that it was:

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Montgomery County be, and it is hereby, reversed, and the matter remanded to the Circuit Court with directions to enter judgment in favor of Appellants and an order that a referendum on the validity of Montgomery County Council Bill No. 13–10 be placed on the ballot at the General Election to be held on November 2, 2010. Costs to be paid by the Appellees. Mandate to issue forthwith.

*Montgomery Cnty. Volunteer Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections,* 416 Md. 73, 73–74, 5 A.3d 683, 683 (2010). The full opinion was issued on March 22, 2011.

those entries. *Fire–Rescue*, 418 Md. at 468, 15 A.3d at 800–801. The trial court granted summary judgment in favor of the Board, "concluding that it had not acted arbitrarily or capriciously in rejecting illegible or partially legible signatures pursuant to the requirements of Maryland statutory and common law, particularly this Court's decision in *Doe*[.]" *Fire–Rescue*, 418 Md. at 468, 15 A.3d at 801.

On review, we determined that the issue was primarily one of statutory construction. We made clear that we were addressing legibility of petition signatures—an issue that had not been discussed in *Doe*. *Fire–Rescue*, 418 Md. at 470–71, 15 A.3d at 802. We held that "§ 6–203(b)(1) directs the election authority to validate a petition signer's entry if there is sufficient cumulative information on the face of the petition, e.g., a signature, a printed name, address, date of signing, and other information required by regulation, evidencing compliance with § 6–203(a), to determine the identity of the signer." *Fire–Rescue*, 418 Md. at 473–74, 15 A.3d at 804. In other words, we cautioned that the Board should not stop the validation process merely because an illegible signature is present in a petition entry. *Fire–Rescue*, 418 Md. at 474, 15 A.3d at 804. We concluded, based on the Board's revised guidelines in light of *Doe*, that the Board "distort[ed] the purpose of § 6–203(a)(1)[, which] is to provide one element among many that the Board must use to satisfy the requirements of validation." *Fire–Rescue*, 418 Md. at 477, 15 A.3d at 806. Reiterating the fact that the purpose of the signature requirement in § 6–203(a)(1) is to provide a personal attestation to the information contained in the entry, we restated our conclusion in *Barnes* "that the signature provided under § 6–203(a)(1) is but one of many pieces of identifying information that the Board must assess to determine the validity of a petition entry." *Fire–Rescue*, 418 Md. at 479–80, 15 A.3d at 807–08.

Appellant in the present case contends that the trial court erred in adopting a "sufficient cumulative information" standard for validating petition signatures because this standard directly contradicts the plain and mandatory language of § 6–

203(a), as well as this Court's holdings in *Doe* and *Fire–Rescue*. Appellant describes the two-step process of validation and verification, asserting that "verification that a signer is a particular registered voter is not a substitute for validation of compliance with the requirements of [Election Law] § 6–203(a)." According to Appellant, this Court held in *Doe* that the dictates of § 6–203(a) are mandatory. Maintaining that the principles expressed in *Doe* were not overruled or modified by *Fire–Rescue*, Appellant asserts that the Court's main focus in *Fire–Rescue* was whether a signature that is entirely or partially illegible should be validated and counted. Appellant claims that Appellees' "argument that a petition entry can contain 'sufficient cumulative information' to require validation, even without information that [Election Law] § 6–203(a) requires ... misreads both the statute and *Fire–Rescue*." Appellant interprets *Fire–Rescue* as affirming the principles stated in *Doe*, and posits that "*Fire–Rescue* does *not* authorize validation of a signature line that lacks the fundamental information that [Election Law] § 6–203 requires."

Contrary to Appellant's position, Appellees read *Fire–Rescue* as announcing a new "sufficient cumulative information" standard for validating petition signatures, such that if the State Board has "sufficient cumulative information" to identify the signer of the petition, the signature should not be invalidated for failing to comply strictly with the provisions of § 6–203(a). In other words, Appellees "do not agree that election officials may gratuitously invalidate the signatures of people whom they have *already successfully identified as registered voters*, and whose eligibility and intention to support the petition in question are manifest."[11] Appellees state that, in

---

**11.** The primary issue before us is one of statutory interpretation. In their Brief, Appellees very briefly complain that, while rejecting as invalid the petition entries of signers who did not satisfy the requirements of § 6–203(a), Appellant found the cumulative information supplied by some of those signers sufficient to update their addresses in Appellant's voter registration records. Appellant conceded that it engages in the practice of using information contained in petition entries

accordance with *Fire–Rescue,* each piece of information in a petition entry should be combined and treated as another step in the process of identifying a signer. Appellees do not dispute that the requirements of § 6–203(a) are mandatory; rather, they claim that the statutory requirements "are mandated for a particular purpose: the purpose of *aiding* identification. They have never been intended as new ways to disqualify signers." In support of their position, Appellees contend that the words "shall be validated and counted if" in § 6–203(b) are "consistent with a 'safe harbor' interpretation, rather than 'shall be *in* validated and *un* counted unless,' which is how the State Board reads this section of the statute." Lastly, consistent with its arguments in favor of a "sufficient cumulative information" standard, Appellees maintain that petition entries by individuals who sign or print nicknames, but whose identities can be established, should be validated and counted.

 In concluding that *Fire–Rescue* announced a new "sufficient cumulative information" standard with which to validate petition entries, the trial court misconstrued our holding in that case. The issue before us in *Fire–Rescue* was legibility of petition signatures and whether the County Board had properly construed § 6–203 to require legible signatures in order to validate referendum petition entries. We did not, explicitly or implicitly, overrule our holding in *Doe* that the requirements of § 6–203(a) are mandatory. Appellees' argument and the trial court's reasoning take the "sufficient cumulative informa-

---

for the purpose of updating voter registration records even when it finds the information insufficient for the purpose of validating the entries under § 6–203(a); Appellant's most recent guidelines, included in the record of this case, provide further evidence of that practice. This issue does not address, for us, however, the question of statutory interpretation. As discussed in this opinion, Appellees stated in the trial court and in this Court that they are not raising any constitutional claims regarding the statute at issue or Appellant's guidelines established to implement the statute. Neither party has presented either a clear factual basis or a sufficiently developed argument for this Court to afford any consideration to the issue of Appellant's use of petition entry information for one purpose but not for another.

tion" language out of context. In context, we merely stated that an illegible signature, alone, should not, pursuant to the plain language and meaning of the statute, result in the Board's refusal to validate a petition entry. Rather, if there is an illegible signature, the Board should continue to engage in the validation process by determining whether the petition entry satisfies all of the requirements under § 6–203(a).

Furthermore, we disagree with Appellees' contention that § 6–203(b) changes our analysis of the mandatory nature of § 6–203(a). The language of § 6–203(b), addressing validation and counting, provides:

> The signature of an individual shall be validated and counted if:
>
> (1) the requirements of subsection (a) of this section have been satisfied;
>
> (2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;
>
> (3) the individual has not previously signed the same petition;
>
> (4) the signature is attested by an affidavit appearing on the page on which the signature appears;
>
> (5) the date accompanying the signature is not later than the date of the affidavit on the page; and
>
> (6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

Under the plain meaning of the statute, subsection (b)(1) requires that the mandates of subsection (a) be satisfied in order to validate and count the particular entry. Because the unambiguous language of subsection (b)(1) indicates that the requirements of subsection (a) are mandatory and must first be satisfied, offering further evidence in support of our holding in *Doe*, we need not look any further to discern the Legislature's intent. Therefore, we hold, in this case, that the trial court erred in adopting a "sufficient cumulative information" standard for Appellant to implement in the validation of

petition entries, and we reject any arguments expressed by Appellee based on that incorrect standard.

## II. New Party Petitions

■ Appellant poses the question of whether the signature validation standard discussed in *Fire–Rescue* applies to validation of petition signatures in both the referendum context and in the context of new party petitions. To the extent that Appellant's question focuses on whether Title 6 of the Election Law Article is applicable to new party petitions, the statutory language clearly states that it is. Our holdings in *Doe* and *Fire–Rescue*, while specifically addressing referendum petitions, apply equally to validation procedures for all petitions covered under § 6–203(a). To the extent that Appellees attempt to raise constitutional claims related to § 6–203, or to Appellant's actions in construing the mandates of the statute, those claims are not properly before this Court. The trial court did not address constitutional claims in its grant of summary judgment, and any constitutional issues Appellees apparently urge us to address have not been sufficiently explained. Therefore, we resolve the issues presented to us in light of principles of statutory construction, and we decline to address any constitutional claims.

Md.Code (2002, 2010 Repl.Vol.), § 6–101(i) defines a "petition" as:

[A]ll of the associated pages necessary to fulfill the requirements of a process established by the law by which individuals affix their signatures as evidence of support for:

(1) placing the name of an individual, the names of individuals, or a question on the ballot at any election;

(2) the creation of a new political party; or

(3) the appointment of a charter board under Article XI–A, § 1A of the Maryland Constitution.

Additionally, Md.Code (2002, 2010 Repl.Vol.), § 6–102(a) of the Election Law Article, addressing applicability of Title 6, provides:

Except as provided in subsection (b) of this section, this title applies to any petition authorized by law to place the name of an individual or a question on the ballot or to create a new political party.

Pursuant to the plain and unambiguous language of those statutes, the Legislature clearly intended for the statutory provisions in Title 6, including, *inter alia,* § 6–203, to be equally applicable to both referendum petitions and new party petitions. Thus, our holdings in *Doe* and *Fire–Rescue* regarding the mandatory nature of the requirements in § 6–203(a) are not limited to factual situations involving referendum petitions. Rather, the requirements of § 6–203(a) apply to new party petitions, such as the petitions at issue in this case, as well.

Appellees also contend that this Court must interpret the relevant statutory provisions, as the trial judge did, so as to avoid any constitutional claims. They suggest that their interpretation of those provisions will avoid the "substantial constitutional issues that would arise under [Appellant's] competing construction." Discussing the importance of ballot access rights, Appellees emphasize that "[o]nce the authenticity of the [petition] signatures and the identity of the signers is admitted, any denial of voting rights based on the particular way a voter writes his name cannot survive even the most delicate judicial scrutiny." Appellees reiterate that they did not ask for the trial court to declare the statute at issue unconstitutional; before this Court, they claim that, because the trial court adopted a construction of the statute that avoided constitutional issues, there was no need to request a declaration of unconstitutionality.

Appellant lists several reasons in support of its position that this Court should not consider Appellees' constitutional claims. First and foremost, Appellant doubts that such issues have been preserved for review by this Court because Appellees "did not request and argue for, or receive, a declaration from the [C]ircuit [C]ourt that the State Board's application of the law in its petition guidelines is unconstitutional as applied to new party petitions." Additionally, Appellant maintains that

this Court should, and can, decide the issues before it on grounds that do not involve addressing constitutional claims. Lastly, Appellant contends that Appellees "offered no evidence in the [C]ircuit [C]ourt on how, or to what extent, the validation standard of [Election Law] § 6–203 burdens their speech or associational rights." Thus, according to Appellant, Appellees have not met their burden of proving infringement of their constitutional rights.

 Pursuant to Maryland Rule 8–131(a), an appellate court ordinarily will not consider any point or question "unless it plainly appears by the record to have been raised in or decided by the trial court[.]" The purpose of this Rule is two-fold:

> (a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation.

*Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006, 1018 (2004) (quoting *Cnty. Council v. Offen,* 334 Md. 499, 509, 639 A.2d 1070, 1075 (1994)); *see State v. Bell,* 334 Md. 178, 189, 638 A.2d 107, 113 (1994); *Zellinger v. CRC Dev. Corp.,* 281 Md. 614, 620, 380 A.2d 1064, 1067–68 (1977); *Hewitt v. State,* 242 Md. 111, 113–14, 218 A.2d 19, 20–21 (1966). Moreover, "[o]rdinarily, an appellate court should review a grant of summary judgment only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872, 873 (1995) (citations omitted); *Federated Dep't Stores, Inc. v. Le,* 324 Md. 71, 79, 595 A.2d 1067, 1071 (1991); *Finci v. Am. Cas. Co.,* 323 Md. 358, 387, 593 A.2d 1069, 1083 (1991).

 The trial judge in this case declined to address the constitutionality of either the statutory provisions at issue or Appellant's actions in interpreting those provisions. In fact, counsel for Appellees explicitly stated during the hearing on the cross-motions for summary judgment, "Now we are of course not asking for the statute to be declared unconstitu-

tional here." Appellees also conceded the same point in their Brief to this Court. Thus, Appellees did not argue, and the trial judge did not find, a constitutional violation pertaining to the issues in this case. In his Order, the trial judge merely determined what he perceived to be the correct interpretation and application of our holding in *Fire–Rescue*, taking into account what he concluded was the "overriding consideration [of] whether the signer can be identified as the registered voter." Accordingly, we decline to address constitutional claims that were not raised in, or decided by, the trial court.

■ Furthermore, we are unsure, based upon Appellees' arguments before the trial court and before this Court, exactly what constitutional rights Appellees claim are being violated by Appellant's current guidelines for implementing the statute at issue. Appellees raise their constitutional arguments in a vague manner without expressly directing us to which provisions of the Federal Constitution or the Maryland Constitution have been violated, or will be violated if we accept Appellant's construction of the relevant statutory provisions. This Court cannot be expected to supplement arguments of the parties that have not been addressed with sufficient specificity anywhere in the record. *See Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061, 1074 (1999) (asserting that "arguments not presented in a brief or not presented with particularity will not be considered on appeal" (citation omitted)).

We agree with Appellant that there are no constitutional issues for this Court to address in this case. The focus of our review is on the contention that *Fire–Rescue* created a new standard to be utilized in petition signature validation cases. We clarify in this opinion that *Fire–Rescue* primarily dealt with signature legibility, but, nonetheless, that case reaffirmed the conclusion in *Doe* that the petition signature requirements under § 6–203(a) are mandatory. In this case, we need not, and do not, address claims not argued by Appellees in the trial court, nor addressed by the trial judge in his grant of summary judgment. In addition, contrary to Appellees' argument in the present case, an application of the principle of constitu-

tional avoidance is unnecessary in this Court's analysis of the issues presented.[12]

## III. Duplicate Signatures

■ The final issue for this Court to address is whether Appellant properly refuses to validate duplicate signatures of individuals who already have signed the same petition. We hold that the trial judge erred in concluding that a signature on a petition may be invalidated as a duplicate only if the individual's prior signature was validated. The plain language of § 6–203(b) indicates that the signature of an individual shall be validated and counted if that individual has not previously signed the same petition, without any mention of the disposition of that previous signature. Accordingly, after Appellant evaluates a petition entry by an individual, and determines whether to validate or invalidate the entry, any additional signature by the same person on the same petition is appropriately invalidated as a duplicate.

Appellant claims that the plain meaning of § 6–203(b)(3) provides support for its position that duplicate or multiple signatures on a petition by the same individual should be invalidated, regardless of whether a previously evaluated sig-

---

**12.** This Court has "long adhered to the policy of not deciding constitutional issues unnecessarily." *Curran v. Price*, 334 Md. 149, 171, 638 A.2d 93, 104 (1994) (citing *Simms v. State*, 288 Md. 712, 725, 421 A.2d 957, 964 (1980)). Thus, "[i]f a decision on a constitutional question is not necessary for proper disposition of the case, we will not reach it." *Id.* (citing *Comm'r of Labor & Indus. v. Fitzwater*, 280 Md. 14, 19, 371 A.2d 137, 140 (1977)). In cases involving statutory interpretation, in conjunction with the concept of constitutional avoidance, we have stated that " 'if a legislative act is susceptible of two reasonable interpretations, one of which would not involve a decision as to the constitutionality of the act while the other would, the construction which avoids the determination of constitutionality is to be preferred.' " *Heileman Brewing v. Stroh Brewery*, 308 Md. 746, 763, 521 A.2d 1225, 1234 (1987) (quoting *Md. State Bd. of Barber Examiners v. Kuhn*, 270 Md. 496, 505, 312 A.2d 216, 221 (1973)). The statutory provisions before us in the instant case are not susceptible to more than one reasonable interpretation; rather, the relevant provisions are governed by their plain and unambiguous meanings. Therefore, the principle of constitutional avoidance is not applicable, and we do not consider it in our analysis of the issues in this case.

nature of that individual has been validated or invalidated. Citing § 6–203(c), a provision allowing for removal of petition signatures, Appellant contends that "[t]he [C]ircuit [C]ourt's decision improperly shifts to the State Board the responsibility that the General Assembly placed instead on petition sponsors, circulators, and signers, to generate one correct, valid, and countable signature for each signer." In addition, Appellant notes that "[a]ny incentive, however marginal, to sign a petition more than once contributes to fraud and mistake in the petition process, in direct opposition to the law's express prohibition [under Md.Code (2002, 2010 Repl. Vol.), § 16–401(a)(9) of the Election Law Article] against signing more than once."

Appellees construe § 6–203(b) differently and contend that "signed" in the context of duplicate signatures must mean "validly signed." While Appellees concede that the issue of duplicate signatures did not amount to a large number of invalidated signatures on the petitions they submitted, the more daunting issue, according to Appellees, is that Appellant's current policy of refusing to validate signatures of individuals who have already signed the same petition "prevent[s] voters whose signatures are rejected from fixing the problem and registering their support as part of a supplemental submission by the petition sponsors." Appellees maintain that the prohibition against validating and counting any individual's signature twice provides sufficient safeguards against the fraudulent purposes that apparently influence Appellant's current guidelines.

As we have stated, we begin an analysis involving statutory interpretation by looking to the plain, normal meaning of the language in the statute. *See Doe*, 406 Md. at 712, 962 A.2d at 351. If the relevant language in the statute is clear and unambiguous, we need not consult any other sources to determine the Legislature's intent. *See id.* Appellees would have us read into the statute the requirement that a signature shall be validated and counted if an individual has not previously *validly* signed the same petition. This we refuse to do. The relevant language in § 6–203(b)(3) provides

that "[t]he signature of an individual shall be validated and counted if ... the individual has not previously signed the same petition[.]" The plain meaning of the word "sign" is "[t]o identify (a record) by means of a signature, mark, or other symbol with the intent to authenticate it as an act or agreement of the person identifying it[.]" *Black's Law Dictionary* 1415 (8th ed.2004). Likewise, a "signature" is "[a] person's name or mark written by that person or at the person's direction." *Id.* Thus, the unambiguous meaning of § 6–203(b)(3) is that a signature is to be validated and counted if the individual has not previously provided a written attestation on the same petition. The language in the statute does not make reference to whether the prior signature was validated or invalidated. Therefore, we conclude that the Legislature did not intend for "signed" to mean "validly signed."

In further support of our conclusion, we note that § 6–203(c) places the onus on the signer, sponsor, and circulator of the petition to correct the error of a potentially improper signature by removing the signature from the petition before it is submitted. The statute provides, in relevant part:

(1) A signature may be removed:

 (i) by the signer upon written application to the election authority with which the petition will be filed if the application is received by the election authority prior to the filing of that signature; or

 (ii) prior to the filing of that signature, by the circulator who attested to that signature or by the sponsor of the petition, if it is concluded that the signature does not satisfy the requirements of this title.

This statutory provision indicates that the Legislature intended to place the burden of correcting a signature error upon the signer, sponsor, and circulator of the petition, not upon the State Board. Appellees, therefore, had an opportunity, before the petitions were submitted, to remove and subsequently correct or replace petition entries that contained defects, including flaws in the signatures.

Lastly, Title 16 of the Election Law Article addresses offenses and penalties, including offenses related to petitions.

In relevant part, § 16–401 provides that "[a] person may not willfully and knowingly . . . sign a petition more than once[.]" Thus, the General Assembly has determined that, in an effort to prevent fraud in the context of new party petitions, it is an offense for a person with the requisite culpability to sign a petition more than once. This provision lends additional support to our conclusion that Appellant appropriately codes as duplicates, and refuses to validate and count, signatures by individuals who already have signed the same petition. Once Appellant evaluates a petition entry by an individual, and determines whether to validate or invalidate the entry, any other entries by the same individual on the same petition that are subsequently evaluated by Appellant are duplicates within the meaning of § 6–203(b) and should not be validated and counted. Therefore, we hold that the trial court erred in determining that a signature on a petition may be invalidated and marked as a duplicate only if a previously evaluated signature by the same individual was validated.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS VACATED. CASE REMANDED TO THAT COURT FOR ENTRY OF A DECLARATORY JUDGMENT NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY APPELLEES.**